# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.                                                    No. 99-3344

ROBERT C. LAHUE,

    Defendant-Appellant.


UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.                                                    No. 99-3347

DAN ANDERSON,

    Defendant-Appellant.


UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.                                                    No. 99-3352

RONALD H. LAHUE,

      Defendant-Appellant.

------------------

THE AMERICAN HOSPITAL
ASSOCIATION; FEDERATION OF
AMERICAN HEALTH SYSTEMS;
ASSOCIATION OF AMERICAN
MEDICAL COLLEGES; AMERICAN
OSTEOPATHIC ASSOCIATION;
MISSOURI HOSPITAL
ASSOCIATION; NATIONAL
ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS,

      Amici Curiae.

---

## ORDER
Filed August 17, 2001

---

Before **ANDERSON**, **BALDOCK** and **BRORBY**, Circuit Judges.

---

These matters are before the court on appellants' petitions for panel rehearing and for rehearing en banc. The petitions for rehearing are denied.

The petitions for rehearing en banc were transmitted to all of the judges of the court who are in regular active service as required by Fed. R. App. P. 35. As no member of the panel and no judge in regular active service on the court requested that the court be polled, those petitions are also denied.

-2-

A revised panel opinion is attached to this order.

Entered for the Court

PATRICK FISHER, Clerk of Court

By:
    Keith Nelson
    Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 18 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 99-3344 |
| ROBERT C. LAHUE, | |
| Defendant-Appellant. | |
| | |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 99-3347 |
| DAN ANDERSON, | |
| Defendant-Appellant. | |
| | |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 99-3352 |

RONALD H. LAHUE,

      Defendant-Appellant.

------------------

THE AMERICAN HOSPITAL ASSOCIATION;
FEDERATION OF AMERICAN HEALTH
SYSTEMS; ASSOCIATION OF AMERICAN
MEDICAL COLLEGES; AMERICAN
OSTEOPATHIC ASSOCIATION; MISSOURI
HOSPITAL ASSOCIATION; NATIONAL
ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS,

      Amici Curiae.

**Appeal from the United States District Court
for the District of Kansas
(D.C. Nos. 98-CR-20030-03, 98-CR-20030-01, 98-CR-20030-04)**

Tanya J. Treadway (Jackie N. Williams, United States Attorney, Topeka, Kansas; William H. Bowne, Department of Justice, Washington, D.C., with her on the brief), Assistant United States Attorney, Topeka, Kansas, for Plaintiff-Appellee.

Bruce C. Houdek of Bruce C. Houdek, P.C., Kansas City, Missouri, for Defendant-Appellant Robert C. LaHue.

James R. Wyrsch (Keith E. Drill, Jacqueline A. Cook, and Cheryl A. Pilate with him on the briefs) of Wyrsch Hobbs Mirakian & Lee, P.C., Kansas City, Missouri, for Defendant-Appellant Dan Anderson.

Jeffrey D. Morris of Bryan Cave LLP, Overland Park, Kansas, for Defendant-Appellant Ronald H. LaHue.

Thomas S. Crane, Tracy A. Minder, Jeffrey D. Clements and Theresa M. Claffey, of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusets,

filed an amici curiae brief for The American Hospital Association, Federation of American Health Systems, Association of American Medical Colleges, and American Osteopathic Association, Missouri Hospital Association.

Vicki Mandell-King, National Association of Criminal Defense Lawyers, Denver, Colorado; Barbara E. Bergman, National Association of Criminal Defense Lawyers, Albuquerque, New Mexico; Philip C. Zimmerman of Holme Roberts & Owen LLP, Denver, Colorado, filed an amicus curiae brief for National Association of Criminal Defense Lawyers.

Before **ANDERSON, BALDOCK** and **BRORBY**, Circuit Judges.

**BRORBY**, Circuit Judge.

Defendants Dan Anderson, Dr. Robert LaHue, and Dr. Ronald LaHue were convicted by a jury for violations of the Medicare Antikickback Act ("Act"), 42 U.S.C. § 1320a-7b(b), which criminalizes any remuneration knowingly and willfully offered, paid, solicited, or received in exchange for Medicare or Medicaid patient referrals, and violation of the conspiracy statute, 18 U.S.C. § 371. *See United States v. Anderson*, 85 F. Supp. 2d 1047, 1053 (D. Kan. 1999). In ruling on defendants' objections during trial and denying their motions for a new trial, the district court concluded: (1) the jury instructions on the Act correctly utilized the "at least in part" or "one purpose" standard; (2) Rule 801(d)(2)(E) of the Federal Rules of Evidence contemplates statements made pursuant to a lawful common plan, which justified the court's admission of over

-3-

sixty documents under the rule; (3) two variances between the indictment and the evidence at trial did not prejudice defendants' right to a fair trial; and (4) it correctly denied defendants' request to provide judicial immunity to selected witnesses in light of this circuit's case law and no indication the government engaged in a deliberate attempt to distort the fact-finding process. *See Anderson*, 85 F. Supp. at 1069-72, 1074-75, 1079-81. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. Background [1]

As a guide, the individuals discussed in this opinion can be broken down into three groups. First, osteopathic physicians Robert and Ronald LaHue ("the LaHues") served as the principals in Blue Valley Medical Group ("Blue Valley"), a specialized medical practice providing care to patients in nursing homes and other residential care facilities. *See McClatchey*, 217 F.3d at 826-27; *Anderson*, 85 F. Supp. 2d at 1052. Second, Baptist Medical Center ("Baptist"), a Kansas

---

[1] Because this case arises from jury verdicts against defendants, we view the evidence in the light most favorable to the prosecution. *See United States v. Woodlee*, 136 F.3d 1399, 1405 (10th Cir.), *cert. denied*, 525 U.S. 842 (1998). This section focuses on evidence applicable to Mr. Anderson and the Drs. LaHue and necessary to resolve their issues on appeal. We refer the reader to two of the published post-trial opinions in this case for a comprehensive review of the evidence. *See Anderson*, 85 F. Supp. 2d 1047; *see also United States v. McClatchey*, 217 F.3d 823 (10th Cir.), *cert. denied*, 121 S. Ct. 574 (2000).

City, Missouri hospital, employed:

> Anderson, Dan (President, Chief Executive Officer)
> Eckard, Tom (Director of Geriatric Services)
> Flynn, Dixie (Director of Geriatric and Gerontology Services)
> Grim, Sarah (Director of Alternative Care Services)
> Grimes, Deborah (Director of Geriatric Services)
> Keel, Ronald (Vice President)
> McClatchey, Dennis (Senior Vice President, Chief Operating Officer)
> McGrath, Kevin (Vice President)
> Probst, Gerard (Chief Financial Officer)

*See McClatchey*, 217 F.3d at 827; *Anderson*, 85 F. Supp. 2d at 1052, 1054-57.

Third, attorneys Ruth Lehr and Mark Thompson represented Baptist at various

times during the course of the alleged conspiracy. *See McClatchey*, 217 F.3d at

827-28; *Anderson*, 85 F. Supp. 2d at 1052.

In the early 1980s, the LaHues were part-time faculty members at

University Hospital, where they referred, admitted, and treated their patients. *See*

*Anderson*, 85 F. Supp. 2d at 1053. In 1984, the LaHues sought an increase in

salary from University Hospital in return for their continued patient referrals, in

light of a competing offer from Baptist for $120,000 to $140,000 per year for the

same patient referrals. *See id.* at 1054. University Hospital declined their

request. *See id.*

In 1985, Baptist entered into a contract ("1985 contract") with the LaHues

making them "Co-Directors of Gerontology Services." *McClatchey*, 217 F.3d at 827; *see Anderson*, 85 F. Supp. 2d at 1054. By this time, the LaHues had approximately 3,500 patients in the Kansas City metropolitan area and a correlatively large number of hospital referrals. *See Anderson*, 85 F. Supp. 2d at 1054-55. Mr. Probst testified the negotiations were "backwards" – establishing the fee first and only then agreeing to the services the LaHues would provide in return – and, from his and Messrs. Anderson, McClatchey, and Keel's perspective, were grounded in the hospital receiving patient referrals.[2] *McClatchey*, 217 F.3d at 827. Mr. Probst described the resulting arrangement as unlike any he had seen in twenty years, and one with "the highest request for an annual consulting fee that I had experienced or had been involved with."

The arrangement evolved into a consulting contract in 1986 between Baptist and the LaHues ("1986 agreement"). *See Anderson*, 85 F. Supp. 2d at 1055-56. The 1986 agreement stated Baptist "desires to obtain the professional services of the [LaHues] to assist it and its affiliate organizations in the development and maintenance of a comprehensive Geriatrics Program, including medical education of health care professionals, quality of care standards, and

---

[2] Mr. Probst testified for the government under a grant of statutory immunity. *See Anderson*, 85 F. Supp. 2d at 1054 n.3.

philosophical and promotional matters relating to the care of the aged." The LaHues' duties under the 1986 agreement included: (1) clinical instruction, training, and information to Baptist's professional staff, including the Adult Health Care Services Clinic ("Clinic"), Emergency Services, Social Services, the medical staff in general, and the hospital administration; (2) instruction and training to the family practice residents and medical students; (3) consultation relating to the development of geriatrics programs and the expansion and utilization of Baptist's services for the aged; and (4) assisting in the completion of applications or reviewing patient care data for grants and studies relating to the medical care and institutional treatment of the aged.

Pursuant to the 1985 contract and the 1986 agreement, Baptist paid $75,000 annually to each of the LaHues from 1985 to 1993, with the exception of 1990 when the LaHues each received $68,750. *See McClatchey*, 217 F.3d at 827 & n.2; *Anderson*, 85 F. Supp. 2d at 1054. [3] Mr. Anderson directed those payments. *See Anderson*, 85 F. Supp. 2d at 1054. When the payments began, Blue Valley referred massive numbers of patients to Baptist, with a

---

[3] Baptist and the LaHues signed a new contract in April 1993, but Dr. Ronald LaHue terminated it in November 1993. *See McClatchey*, 217 F.3d at 827-28. "Two temporary agreements sustained the payments to the LaHues through June of 1984." *Id.* at 828.

corresponding halt in referrals to University Hospital. *See Anderson*, 85 F. Supp. 2d at 1062. Blue Valley referred 8-10% of Baptist's hospital admissions and over 90% of the out-patient volume in its Clinic, which made it Baptist's largest referral source.

Ms. Grim, Baptist's Director of Alternative Care Services from 1984 to 1985, testified that Mr. Anderson: (1) made it clear to her the Baptist-Blue Valley relationship was a business deal in which Baptist would pay money to Blue Valley in return for patient referrals; and (2) told her he was very protective of the Baptist-Blue Valley relationship, because, in her words, Baptist was "going to get patients. It was about occupancy." Ms. Grimes, Baptist's Director of Geriatric Services from approximately 1986 to 1988, testified she was not aware of the 1985 contract, which purportedly made the LaHues Co-Directors of Gerontology Services.

In the summer of 1985, the LaHues approached Mr. Anderson for help in managing their practice. *See McClatchey*, 217 F.3d at 827; *Anderson*, 85 F. Supp. 2d at 1055, 1064. Mr. Anderson placed one of Baptist's employees,

Thomas Eckard, [4] with Blue Valley soon thereafter, but kept him on the Baptist payroll. *See McClatchey*, 217 F.3d at 827; *Anderson*, 85 F. Supp. 2d at 1055. "Although [Mr.] Eckard's official title was Director of Geriatric Services for Baptist, [he] worked at [Blue Valley] and effectively acted as [Blue Valley]'s manager." *McClatchey*, 217 F.3d at 827.

Based on his discussions with Messrs. Anderson and McClatchey, and others, Mr. Eckard understood his primary job responsibility was to maintain Baptist's relationship with Blue Valley in order to ensure the continued flow of patients to the hospital. *See Anderson*, 85 F. Supp. 2d at 1055. Mr. Eckard remained on the Baptist payroll and worked at Blue Valley in this capacity for approximately eight years. *See id.*

Mr. Anderson and the Baptist management team were aware Blue Valley never compensated Baptist for Mr. Eckard's management services. Drawing on his thirty-two-year career in the health care industry, Mr. Anderson testified he was "not aware of any [situation] that's identical to what we had with Blue Valley Medical Group and Tom Eckard." Mr. McClatchey testified it was a one-

---

[4] Mr. Eckard pled guilty to conspiracy to violate 18 U.S.C. § 666 and cooperated with the government. *See Anderson*, 85 F. Supp. 2d at 1055 n.4.

of-a-kind relationship.

Mr. Eckard described the services provided by the LaHues pursuant to the 1985 contract as "'minimal to none.'" *Anderson*, 85 F. Supp. 2d at 1056 n.6, 1062 (quoting Mr. Eckard's testimony). Indeed, with Mr. Anderson's approval, the relationship changed to a consulting agreement in 1986, because the LaHues did not perform their duties under the 1985 contract. *Id.* at 1056, 1065. However, this change did not significantly affect the amount of services the LaHues provided to Baptist. Numerous witnesses "testified that the LaHues performed very few actual services in return for the substantial annual sum they were paid." *Id.* at 1062.

For example, Mr. Eckard testified his observations over the eight and one-half years of the Baptist-Blue Valley relationship revealed the LaHues did not provide the enumerated services in the agreements on a routine basis. Specifically, Mr. Eckard testified the LaHues: (1) never operated the Clinic; (2) only went on rounds with the Clinic staff "four or five times"; (3) provided "very little" in-service medical education and training to Baptist personnel; (4) spent "very minimal" amounts of time meeting with Baptist emergency room personnel on issues other than patient care; (5) only met with the emergency room nurses

"two or three times"; and (6) trained Baptist family practice residents just "a few times."

Ms. Grimes sent Mr. McClatchey the following memorandum on March 3, 1987:

> The [Blue Valley] contract, effective June 1, 1986, stipulated scheduled activities to be carried out through the year (see enclosed). As of this date only one activity, quarterly staff meetings, has been implemented. I feel that it is in Baptist Medical Center's best interest to promptly implement the activities as outlined in the contract.

*See Anderson*, 85 F. Supp. 2d at 1056.

Ms. Flynn, Baptist's Director of Geriatric and Gerontology Services from 1988 to 1990, had operational responsibility for the Clinic and met weekly with Mr. Anderson, who she characterized as "very knowledgeable" regarding the Clinic and its operation. She testified the LaHues did not provide her any administrative consulting regarding supervision, budgeting, policy and procedure development, or standard of care development for the Clinic. Further, all the clinical development work was performed by Ms. Flynn and others; the LaHues only made recommendations as to the types of clinics to be created.

Regarding the services listed in the 1986 agreement as those sought by

Baptist from the LaHues, Ms. Flynn testified: (1) the LaHues did nothing to develop a comprehensive geriatrics program at Baptist; (2) she did not observe them providing any medical education to health care professionals; (3) they had "very limited" contact with the physicians who treated their patients at Baptist; and (4) did not contribute regarding quality of care issues. Turning to the LaHues' enumerated duties in the 1986 agreement, Ms. Flynn testified she neither observed nor knew of the LaHues: (1) providing appropriate clinical instruction and training to the professional staff at Baptist; (2) performing rounds with Baptist personnel; (3) providing instruction or training to the Baptist family practice residents; (4) developing geriatric programs or expansion and utilization of Baptist services; and (5) developing grants or studies. Most importantly, none of the Baptist management team ever asked her whether the LaHues provided the required services. She also testified she would not have budgeted any money for the services the Clinic received from the LaHues. In summary, she stated: "I felt more like I was working for them rather than them being available to me," and, had she known about the $150,000 payments to the LaHues per year, she stated: "I would have been alarmed."

In late 1991/early 1992, Mr. McGrath [5] learned from Dr. Robert LaHue that he and Dr. Ronald LaHue were not performing some of the services listed in the 1986 agreement. *See McClatchey*, 217 F.3d at 828. Further, Mr. McGrath received documentation the LaHues provided consulting for only approximately two hours per week. *See id.* at 830. Mr. McGrath discussed this information with Messrs. Anderson, McClatchey and Thompson, and expressed his concern the two hours per week did not justify the fees Baptist was paying the LaHues. *See id.* at 828. Messrs. Anderson, McClatchey, and Thompson neither disputed the accuracy of nor told Mr. McGrath the LaHues were performing other services not reflected in this documentation.

Nonetheless, the payments from Baptist to the LaHues continued. During 1993 and 1994, when it appeared the relationship with the LaHues might soon end, "Mr. Anderson worked to develop a strategy to replace the [Blue Valley] patients but did nothing to replace the LaHues' consulting services." [6] *See*

---

[5] Mr. McGrath testified for the government under a grant of statutory immunity. *See Anderson*, 85 F. Supp. 2d at 1057 n.9.

[6] Mr. Anderson claims Baptist "entered into an agreement ... with Drs. Leonard Hock and Cathy Weatherford to perform essentially the same services provided by the LaHues in prior consulting agreements." The record does not support this claim, because Dr. Weatherford (with Dr. Hock as backup) contracted to be the Clinic's Medical Director. This role was previously handled by Dr. Nevada Lee, and the efforts of Drs. Weatherford and Hock appear to have focused on primary patient care services in the

*Anderson*, 85 F. Supp. 2d at 1065.  As stated by the district court in its ruling on the defendants' post-trial motions:  "Mr. Anderson knew the payments he directed were more than fair market value for consulting services, that the services specified ultimately proved to be not entirely bona fide, and that the services specified were not sufficiently being performed."     *Id.*

The LaHues and Baptist benefitted greatly from their relationship.  The LaHues received over $1.8 million from Baptist as a result of the various contracts and Mr. Eckard's unreimbursed salary, and Baptist received over $39.5 million from Medicare for services rendered to Blue Valley's patients.

With Mr. Eckard's assistance, Blue Valley entered into similar arrangements or contracts with four other hospitals:  (1) from 1991 to 1994, St. Joseph's Medical Center paid Blue Valley over $341,000 and received over $4.9 million from Medicare; (2) from 1990 to 1992, Deaconess Medical Center paid Blue Valley $125,000 and received over $2 million from Medicare; (3) from 1992 to 1994, Bethany Medical Center paid Blue Valley over $169,000 and received over $3.5 million from Medicare; and (4) from 1992 to 1994, Alexian

Clinic.

-14-

Brothers Hospital paid Blue Valley $190,000 and received over $5.6 million from

Medicare. *See Anderson* , 85 F. Supp. 2d at 1060-61. Around 1992, Liberty

Hospital refused the LaHues' offer to enter a similar arrangement or contract.

*See id.* at 1061.


II. Procedural History

In pertinent part, the Act provides:

(1) whoever knowingly and willfully solicits or receives any remuneration ... directly or indirectly, overtly or covertly, in cash or in kind –

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program ...

....

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration ... directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program ...

....

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Baptist executives Mr. Anderson, Mr. McClatchey and Mr. Keel as well as attorneys Ms. Lehr and Mr. Thompson were each charged with one count of conspiracy to violate the Act with the LaHues and six other hospitals, and one substantive count of violating the Act. *See Anderson*, 85 F. Supp. 2d at 1052. The LaHues were each charged with one count of conspiracy to violate the Act with Baptist and six other hospitals, seven substantive counts of violating the Act, and a false claims conspiracy count in violation of 18 U.S.C. § 286. *See id.* Dr. Robert LaHue was also charged with threatening a witness in violation of 18 U.S.C. § 1512. *See id.*

At the close of the government's case, the district court: (1) granted the attorneys' motions for acquittal; (2) ruled the government failed to present sufficient evidence to demonstrate that any defendant but the LaHues participated in a conspiracy extending to the six other hospitals; [7] (3) severed the false claims and witness tampering counts as improperly joined pursuant to Fed. R. Crim. P.

---

[7] Accordingly, the district court limited the jury's consideration of all evidence concerning the other hospitals to the charges against the LaHues.

8(b);[8] and (4) dismissed one of the substantive counts against the LaHues on statute of limitations grounds. *See id.* at 1053.

On completion of a nine-week trial, the jury: (1) convicted Mr. Anderson on both charges; (2) convicted Mr. McClatchey on both charges; (3) acquitted Mr. Keel on the basis of his statute of limitations defense; (4) convicted Dr. Ronald LaHue of the conspiracy charge and four of the substantive charges of violating the Act; and (5) convicted Dr. Robert LaHue of the conspiracy charge and six of the substantive charges of violating the Act. *See id.* The district court granted Mr. McClatchey's motion for judgment of acquittal or, in the alternative, a new trial, and granted Dr. Ronald LaHue's motion for acquittal as to the substantive count charging him with a violation of the Act with regard to Alexian Brothers Hospital. *See id.* at 1051-52, 1061, 1063-68.

The district court: (1) sentenced Mr. Anderson to fifty-one months imprisonment, a $75,000 fine, a $100 special assessment, and three years supervised release; (2) sentenced Dr. Ronald LaHue to thirty-seven months imprisonment, a $25,000 fine, a $200 special assessment, and three years

---

[8] On the government's post-trial motion, the court dismissed the false claims count with prejudice and the witness tampering count without prejudice. (Doc. #415.)

supervised release; and (3) sentenced Dr. Robert LaHue to seventy months imprisonment, a $75,000 fine, $142,040 restitution, a $350 special assessment, and three years supervised release.

There are four issues on appeal. All three defendants raise the following two issues: (1) whether the district court adopted an improperly broad construction of the Act, thereby erroneously instructing the jury under a "one purpose test" which effectively criminalized innocent conduct; and (2) whether the district court erred in admitting numerous co-conspirator statements under a so-called "joint venture" theory, thereby violating Fed. R. Evid. 801(d)(2)(E) and defendants' constitutional right to confrontation. Mr. Anderson and Dr. Robert LaHue raise the third issue: (3) w hether the district court erred in failing to grant a new trial based on prejudicial variances between the indictment and evidence at trial. Finally, the LaHues raise the fourth issue: (4) whether the district court abused its discretion by refusing to grant use immunity to twelve proposed defense witnesses who invoked the Fifth Amendment and refused to testify after the government identified them as unindicted co-conspirators in this case.

Before the government filed its consolidated brief in this appeal, another panel of this court published its opinion resolving the government's appeal of the

district court's judgment of acquittal and the alternative grant of a new trial for Mr. McClatchey. *See McClatchey*, 217 F.3d at 826. This court reversed the district court's judgment and order, and remanded with instructions to reinstate the jury verdict against Mr. McClatchey. *See id.* at 836. This opinion is critical to our resolution of the first and third issues on appeal here, as we will detail in those sections of our discussion. *See infra* Part III.A, C.

## III. Discussion

### A. Jury Instruction on and Construction of the Act

Defendants [9] claim the applicable jury instructions on the Act – Instruction #32 [10] for Mr. Anderson and Instruction #33 [11] for the LaHues – are incorrect and

---

[9] In this section, "defendants" refers to Mr. Anderson and the LaHues.

[10] In Instruction #32, the district court charged the jury as follows:

> In order to sustain its burden of proof against the hospital executives for the crime of violating the Anti-Kickback statute, the government must prove beyond a reasonable doubt that the defendant under consideration offered or paid remuneration with the specific criminal intent "to induce" referrals. To offer or pay remuneration to induce referrals means to offer or pay remuneration with intent to gain influence over the reason or judgment of a person making referral decisions. The intent to gain such influence must, *at least in part*, have been the reason the remuneration was offered or paid.

> On the other hand, defendants Anderson, Keel, and McClatchey cannot be convicted merely because they hoped or expected or believed that referrals may ensue from remuneration that was designed wholly for other

warrant a new trial. Specifically, they challenge the "at least in part" or "one

purpose" standard applied in these two instructions. In other words, they argue a

defendant should not be convicted under the Act when his offer, payment,

solicitation, or receipt of remuneration was motivated merely *in part* to induce or

in return for referrals; rather, they suggest conviction is only appropriate when

---

purposes. Likewise, mere oral encouragement to refer patients or the mere
creation of an attractive place to which patients can be referred does not
violate the law. There must be an offer or payment of remuneration to
induce, as I have just defined it.

(Emphasis added.)

[11] In Instruction #33, the district court charged the jury as follows:

Likewise, in order to sustain its burden of proof against the doctor
defendants for violating the Anti-Kickback statute, the government must
prove beyond a reasonable doubt that the defendant under consideration
solicited or received the remuneration with specific criminal intent that the
remuneration be "in return for" referrals. To solicit or receive remuneration
in return for referrals means to solicit or receive remuneration with intent to
allow the remuneration to influence the reason and judgment behind one's
patient referral decisions. The intent to be influenced must, *at least in part*,
have been the reason the remuneration was solicited or received.

On the other hand, defendants Robert LaHue and Ronald LaHue
cannot be convicted merely because they received remuneration wholly in
return for services and also decided to refer patients to the hospital.
Likewise, mere referral of patients because of oral encouragement or
because of a belief that the place to which the patients are to be referred is
attractive does not violate the law. There must be a solicitation or receipt of
remuneration in return for referrals, as I have just defined it.

(Emphasis added.)

the motivation to induce or in return for referrals was the defendant's *primary purpose* .

In their opening briefs – filed before the *McClatchey* panel published its decision – defendants correctly noted this was an issue of first impression in this circuit, and argued for the rejection of the "one purpose" standard enunciated by the Third Circuit in *United States v. Greber* , 760 F.2d 68 (3d Cir.), *cert. denied* , 474 U.S. 988 (1985).  Defendants argued the "one purpose" standard was inappropriate because:  (1) "[i]t converts a criminal statute passed with a specific aim – to deter and punish abusive practices that threaten the integrity of federally funded health care programs – into prohibition of *all* arrangements, no matter how slight, that implicate patient referrals" (emphasis in original); (2) as a policy matter, it will destroy highly beneficial health care arrangements; (3) statutory construction principles require a narrower interpretation of the Act; (4) the Department of Health and Human Services, charged by statute in 1987 to promulgate regulations defining conduct not subject to the Act's prohibitions, did not provide "any authoritative interpretation of the [Act] as it applied to hospital-physician relationships" during the term of the charged conspiracy; and (5) it leads to "unduly confusing" jury instructions and courts should utilize the actual language of the Act instead.  Finally, anticipating this court's potential agreement

with *Greber* , defendants argued the "one purpose" standard renders the Act unconstitutionally vague by vesting undue discretion in "government officials to decide what is legal and what is illegal."

In *McClatchey* , this court rejected Mr. McClatchey's same argument "that the district court improperly instructed the jury it could convict [him] if remuneration was paid ' *at least in part* ' to induce patient referrals." *McClatchey* , 217 F.3d at 826, 834 (emphasis added). We held Instruction #32 "accurately informed the jury of the applicable law," because "a person who offers or pays remuneration to another person violates the Act, so long as *one purpose* of the offer or payment is to induce Medicare or Medicaid patient referrals." *Id.* at 835 (emphasis added). We recognized "[t]he only three Circuits to have decided this issue have all adopted the 'one purpose' test." *Id.* (citing cases from the Third, Fifth, and Ninth Circuits). Our decision to adopt the "one purpose" test rested upon our review of, and agreement with, the "sound reasoning" of the Third Circuit in *Greber*. *Id.* In this appeal, the government claims defendants' challenges to Instructions #32 and 33 are foreclosed by the *stare decisis* effect of *McClatchey* , the Act as construed by *McClatchey* is not void for vagueness under due process, and, therefore, defendants are not entitled to a new trial based on the

jury instructions.  We agree with the government. [12]

"We are bound by the precedent of prior panels absent en banc reconsideration or a superceding contrary decision by the Supreme Court." *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam), *cert. denied*, 513 U.S. 807 (1994).  In this case, defendants' petition for initial hearing *en banc* on this issue was denied, and the Supreme Court has not decided a case on the Act since our *McClatchey* decision.  *See* Order filed August 3, 2000.  Accordingly, *McClatchey* is controlling authority, [13] and we must conclude Instruction #32 accurately informed the jury of the law applicable to Mr. Anderson.

Similarly, we conclude the reasoning underlying the *McClatchey* holding

---

[12] Our resolution of these issues moots defendants' sufficiency of the evidence challenge to Counts One and Three of the indictment, which is predicated on our finding the "primary purpose" standard applies.

[13] Defendants cite *United States v. Boyd*, 958 F.2d 247, 249-50 (8th Cir. 1992) to support their argument that *McClatchey* does not control here.  *Boyd* is inapposite, because it dealt with a *res judicata* argument by the government on issues not briefed by the parties to the first appeal or decided by the district court.  *See Boyd*, 958 F.2d at 249. In this case, we rely on our *In re Smith* rule, which is based on *stare decisis*, *see United States v. Nichols*, 169 F.3d 1255, 1261 (10th Cir.), *cert. denied*, 528 U.S. 934 (1999), and the jury instruction issue was both briefed by the parties in the first appeal, *see McClatchey*, 217 F.3d at 826, 831, 834-35, and decided by the district court pursuant to defendants' motions for a new trial.  *See Anderson*, 85 F. Supp. 2d at 1069, 1074-75.

applies equally to remuneration solicited or received in return for Medicare or Medicaid patient referrals. *See United States v. Meyers*, 200 F.3d 715, 720 (10th Cir. 2000) ("The precedent of prior panels which this court must follow includes not only the very narrow holdings of those prior cases, but also the reasoning underlying those holdings, particularly when such reasoning articulates a point of law."); *see also McClatchey*, 217 F.3d at 835 (citing the Ninth Circuit's opinion in *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989) adopting the "one purpose" standard); *Kats*, 871 F.2d at 108 (adopting the "one purpose" standard and affirming the defendant's conviction for receiving kickbacks in exchange for referral of Medicare payments). As a practical matter, if we held otherwise, we could illogically be faced with a case in which the offeror/payor is deemed to violate the Act, but the offeree/payee is not. Accordingly, we conclude Instruction #33 accurately informed the jury of the law applicable to the LaHues.

We turn to defendants' due process challenge to our "one purpose" interpretation of the Act as unconstitutionally vague, which is the only unresolved issue after *McClatchey* and our above conclusions. "When reviewing a statute alleged to be vague, courts must indulge a presumption that it is constitutional, and the statute must be upheld unless the court is satisfied beyond all reasonable doubt that the legislature went beyond the confines of the

-24-

Constitution." *United States v. Day*, 223 F.3d 1225, 1228 (10th Cir. 2000) (quotation marks and citation omitted). "Under settled law, a broadly worded statute can be sufficiently clarified by a narrowing, authoritative interpretation to fend off a vagueness challenge." *Dirks v. SEC*, 802 F.2d 1468, 1471 (D.C. Cir. 1986).

Defendants appear to argue this court's "one purpose" interpretation of the Act is unconstitutional on its face and as applied to them. As a preliminary matter, we hold their facial challenge is prohibited. *See United States v. Gaudreau*, 860 F.2d 357, 360-61 (10th Cir. 1988). Facial challenges are permitted when the statute "threaten[s] to chill constitutionally protected conduct" and "in some instances ... on pre-enforcement review." *Id.* at 360-61. In this case, defendants have not argued, nor do we perceive, that the Act threatens to chill constitutionally protected conduct,[14] and this is not a pre-enforcement situation. *See id.* at 361. Accordingly, we must examine the Act, as applied in this case, for vagueness in light of the conduct with which defendants are charged. *See id.*

_____

[14] *See Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) ("[The Act] chills no constitutional rights."); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 32-33 (1st Cir. 1989) ("[T]he [Act] is not the type that can be used to chill constitutionally protected rights.").

-25-

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "The same facets of a statute usually raise concerns of both fair notice and adequate enforcement standards.  Hence the analysis of these two concerns tends to overlap.  The Supreme Court, however, while ... recognizing the second concern as more important, continues to treat each as an element to be analyzed separately."  *Gaudreau*, 860 F.2d at 359-60.  We evaluate each element in turn. [15]

Regarding fair notice, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness."  *Day*, 223 F.3d at 1228 (addressing the defendant's vagueness challenge to a federal criminal statute)

_____

[15] Defendants base their vagueness challenge primarily on the alleged inadequacy of enforcement standards under a "one purpose" test.  Because they claim cases evaluating the Act under the fair notice element are "irrelevant," defendants do not address whether they could reasonably understand their conduct was prohibited by the Act. *See Gaudreau*, 860 F.2d at 360 ("[C]riminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." (quotation marks, alteration, and citation omitted)); *see also Day*, 223 F.3d at 1229 (same).  Accordingly, in order to resolve this question and in light of the interrelated nature of the fair notice and enforcement standards inquiries, we address the fair notice element as well.  *See Gaudreau*, 860 F.2d at 359-60.

(quotation marks and citations omitted). In this case, the evidence produced at trial clearly demonstrated defendants negotiated and entered "consulting" contracts in an attempt to camouflage an underlying agreement to exchange remuneration for patient referrals. Therefore, defendants' conduct is the very conduct contemplated by the Act, and they cannot successfully challenge the Act for vagueness as to fair notice. *See id.* at 1228-29.

Specifically, the record shows the following about the Baptist-LaHues relationship: [16] (1) the LaHues entered negotiations with Baptist, because University Hospital refused to acquiesce to their demand for an increased salary in return for continued patient referrals; (2) the 1985 contract and 1986 agreement established a fee of $150,000 per year from Baptist to the LaHues; (3) Baptist and the LaHues resolved the fee before discussing an arrangement to justify it; (4) from Mr. Anderson's perspective, these negotiations were grounded in the hospital receiving patient referrals, and he told Ms. Grim the Baptist-Blue Valley relationship was a business deal in which Baptist would pay money to

---

[16] We need address only the Baptist-LaHues relationship because of its similarity to: (1) Dr. Robert LaHue's interaction with the five other hospitals for which he was convicted of violating the Act; and (2) Dr. Ronald LaHue's interaction with the two other hospitals for which he was convicted of violating the Act. *See Anderson*, 85 F. Supp. 2d at 1060-64; *supra* Part I.

Blue Valley in return for patient referrals; and (5) once Baptist began the payments, Blue Valley referred massive numbers of patients to Baptist with a corresponding halt in referrals to University Hospital.

Further evidence substantiates this was a pay-for-patients scheme. For instance, the record on whether the LaHues fulfilled their commitments under the 1985 contract and 1986 agreement and Mr. Anderson's knowledge thereof reveals: (1) Ms. Grimes was unaware of the 1985 contract, which purportedly made the LaHues co-directors of gerontology services, and she documented the LaHues' failure to fulfill all but one of the activities required of them in the 1986 agreement as of March 1987; (2) Ms. Flynn testified the LaHues did nothing required of them in the 1986 agreement from 1988 to 1990, and intimated Mr. Anderson knew this because he was "very knowledgeable" about the Clinic's operations; (3) in late 1991/early 1992, Mr. McGrath met with Mr. Anderson and discussed (a) Dr. Robert LaHue's statement that he and Dr. Ronald LaHue were not performing some of the services listed in the 1986 agreement, and (b) documentation reflecting the LaHues consulted at Baptist for only two hours per week [17]; and (4) Mr. Eckard testified the LaHues provided minimal to no services

_____

[17] Annualizing this data, Baptist was paying the LaHues the effective rate of $1,442 per hour.

-28-

under the 1985 contract, and failed to provide the enumerated services in the 1986 agreement on a routine basis, if at all.

Finally, we note the evidence supports the following conclusions: (1) although Mr. Anderson controlled whether the payments would continue, he did not stop them when he learned the services were neither entirely bona fide nor performed by the LaHues, and the payments were more than fair market value for consulting services; and (2) when it appeared the Baptist/LaHues relationship might end in 1994, Mr. Anderson worked to develop a strategy to replace the Blue Valley patients, but did nothing to replace the LaHues' consulting services. We therefore conclude the evidence produced at trial demonstrated defendants knew their conduct, which was clearly a pay-for-patients scheme, was prohibited by the Act. Accordingly, their vagueness challenge as to fair notice must fail. *See Day*, 223 F.3d at 1228-29.

Regarding the adequacy of enforcement standards, "[d]ue process requires that legislation state reasonably clear guidelines for law enforcement officials, juries, and courts to follow in discharging their responsibility of identifying and evaluating allegedly illegal conduct." *Gaudreau*, 860 F.2d at 363. "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit

'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)). A statute is unconstitutionally vague if its language and construction by the courts vest authority in law enforcement officers, prosecutors, and juries to assign their own subjective meaning to an element of the offense. *See Kolender*, 461 U.S. at 355-61; *Gaudreau*, 860 F.2d at 363-64. [18]

Even if defendants understood the illegality of a pay-for-patients scheme under the Act, they claim the Act is unconstitutionally vague because it encourages arbitrary enforcement. Defendants argue "prosecutors and agency officials may choose to proceed criminally against virtually anyone in the health care community" under the "one purpose" test, which they describe as having "limitless reach." Specifically, they claim the "one purpose" test

---

[18] For example, the Supreme Court struck down as unconstitutionally vague a statute criminalizing a person's failure to provide "credible and reliable" identification to police during a valid investigative detention, because the determination of the credibility and reliability of identification was left to the subjective judgment of the police. *See Kolender*, 461 U.S. at 355-61. In light of the "full discretion accorded to the police," the Court concluded the statute "furnishes a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, and confers on police a virtually unrestrained power to arrest and charge persons with a violation." *Id.* at 360 (quotation marks and citations omitted).

makes virtually every arrangement between a hospital and a physician unlawful, because the hospital executive will always have patient referrals in mind, at least to some degree....

... In other words, in the hospital-physician context at least, according to the district court, *all conduct is illegal* unless the [Department of Health and Human Services] has expressly, or through an 'advisory' dispensation, made a specific act legal.

We disagree for two reasons.

First, the Act explicitly prohibits any remuneration knowingly and willfully offered or paid to induce, or solicited or received in return for, Medicare or Medicaid patient referrals. *See* 42 U.S.C. § 1320a-7b(b). Defendants fail to point to any language in the Act or the "one purpose" test that vests authority in law enforcement officers, prosecutors, and juries to assign their own subjective meaning to an element of the offense. We do not perceive any such problem, and conclude a fair reading of the Act provides reasonably clear guidelines for law enforcement officials, juries, and courts to evaluate and discern illegal conduct. *See Gaudreau*, 860 F.2d at 363-64. Moreover, it is the application of the Act to defendants by law enforcement officials we review; in an "as applied" examination, defendants may not generalize beyond the conduct with which they are charged. *See id.* at 360-61. As noted above, the evidence produced at trial shows defendants clearly participated in a pay-for-patients scheme. Thus, enforcement of the Act as applied to defendants was not arbitrary or

-31-

discriminatory. *See United States v. Corrow*, 119 F.3d 796, 804 (10th Cir. 1997) ("Our analysis of the fairness issue infuses our disposition of the second vagueness concern, the potential for arbitrary and discriminatory enforcement."), *cert. denied*, 522 U.S. 1133 (1998).

Second, defendants' argument ignores the actual instructions given in this case. The district court instructed the jury that

> [Mr.] Anderson ... cannot be convicted merely because [he] hoped or expected or believed that referrals may ensue from remuneration that was designed wholly for other purposes. Likewise, mere oral encouragement to refer patients or the mere creation of an attractive place to which patients can be referred does not violate the law.

The district court further instructed the jury that

> Robert LaHue and Ronald LaHue cannot be convicted merely because they received remuneration wholly in return for services and also decided to refer patients to the hospital. Likewise, mere referral of patients because of oral encouragement or because of a belief that the place to which patients are to be referred is attractive does not violate the law.

This application of the Act by the district court clearly allows business relationships between a hospital and physician where the motivation to enter into the relationship is for legal reasons entirely distinct from the collateral hope for or decision to make referrals. *See McClatchey*, 217 F.3d at 834 & n.7. Accordingly, contrary to defendants' assertion, the Act, as applied in this case, does not make all conduct illegal when a hospital executive or physician has

-32-

referrals in mind.

In summary, under the controlling authority of *McClatchey* and for the other reasons articulated herein, we conclude the district court correctly instructed the jury on the Act. We hold the Act, as applied to defendants, is not unconstitutionally vague. Accordingly, defendants are not entitled to a new trial on this issue.

B. Rule 801(d)(2)(E) of the Federal Rules of Evidence

Rule 801(d)(2)(E) of the Federal Rules of Evidence excludes from the hearsay prohibition "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).

> In order for statements to be admissible under Rule 801(d)(2)(E), the proponent of the evidence must establish, by a preponderance of the evidence, that: (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made during the course of, and in furtherance of, the conspiracy.

*United States v. Williamson*, 53 F.3d 1500, 1517-18 (10th Cir.) (citations omitted), *cert. denied*, 516 U.S. 882 (1995).

Defendants [19] claim the district court erroneously admitted over sixty documents under Rule 801(d)(2)(E).  Specifically, they challenge the district court's conclusion that the word "conspiracy" includes a lawful common plan, and therefore argue documents related to such a plan are inadmissible.  The government argues the district court correctly determined Rule 801(d)(2)(E) contemplates any common plan or enterprise, whether legal or illegal, in which the declarant and Mr. Anderson or the LaHues jointly participated.  In the alternative, the government claims any error in admitting the documents under Rule 801(d)(2)(E) was harmless.

We conclude the admission of these disputed documents constitutes harmless error. [20]  *See United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995) ("While we review evidentiary rulings by considering the record as a whole, deference to the trial judge is heightened when reviewing rulings on hearsay questions.  This court applies a harmless error standard when reviewing trial courts' rulings on hearsay objections resting solely on the Federal Rules of Evidence.");  *United States v. Perez*, 989 F.2d 1574, 1582 (10th Cir. 1993) (en

---

[19] In this section, "defendants" refers to Mr. Anderson and the LaHues.

[20] Accordingly, we will not address the government's alternative theories of admissibility argument.

banc) (before considering whether remand is appropriate for an alleged Rule 801(d)(2)(E) error, this court should assume the challenged statements were inadmissible and then assess whether their admission was harmless error). In applying the harmless error standard, we must first resolve whether defendants' objection to the documents rested solely on the Federal Rules of Evidence. On appeal, defendants argue the admission of these documents violated their Sixth Amendment right to confrontation. However, the government claims defendants did not raise this Confrontation Clause argument to the district court, and waived it on appeal by failing to claim the district court committed plain error by not raising the issue *sua sponte*.

"[W]here a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise the constitutional issue *sua sponte*." *United States v. Perez*, 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc). Defendants do not respond to the government's argument in their reply brief, and, as the government claims, they do not argue the district court committed plain error in failing to raise the constitutional issue *sua sponte*. For this reason, we deem the issue waived. *See United States v. Hardwell*, 80 F.3d 1471, 1492 (holding issue waived when party failed "to make any argument or cite any

-35-

authority to support his assertion"), *reh'g granted in part on other grounds*, 88 F.3d 897 (10th Cir. 1996). Accordingly, we are left to review only a hearsay objection, which we review under the nonconstitutional harmless error standard. *See Perez*, 989 F.2d at 1582.

"A [nonconstitutional] harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." *Jones*, 44 F.3d at 873. A conclusion that an alleged error is harmless completes our review of a hearsay objection. *See id.* at 873-75. The Background section of this opinion is supported by witness testimony and exhibits to which there is no objection on appeal; in other words, it was constructed without any reference to the disputed documents. *See supra* Part I. Our review of the disputed documents, coupled with the overwhelming evidence of defendants' guilt of the charged offenses revealed in the Background section, convinces us that the admission of the disputed documents did not substantially influence the trial's outcome and does not leave us in grave doubt as to whether they had such effect. *See supra* Part III.A. Accordingly, even if the district court erroneously admitted the disputed documents, we hold their admission constituted harmless error.

Finally, defendants claim "the district court failed to require the government to identify the declarant of the hearsay statements being admitted into evidence over the objection of the defense." However, they fail to identify the specific statements the district court allegedly admitted in error, or even meet our requirement of providing citations to the record where these statements may be found. *See* Fed. R. App. P. 28(a)(9)(A); Tenth Cir. R. 28.2(C)(2), (3)(a). "Due to these failures, this court cannot even attempt to assess the merits of [their] argument. The issue of the admissibility of this evidence is therefore waived on appeal." *McClatchey*, 217 F.3d at 835-36.

C. Variances

Mr. Anderson and Dr. Robert LaHue claim certain variances between the indictments and case presented at trial substantially prejudiced their right to a fair trial. In its ruling on their motions for a new trial, the district court stated: "The court agrees with the defendants that there were two variances in this case. The first was the variance the court recognized at trial when it narrowed the count one conspiracy. The second was the variance with respect to the government's failure of proof as to the lawyer defendants." *Anderson*, 85 F. Supp. 2d at 1070.

More specifically, the "other hospitals variance" represents the

government's failure to present sufficient evidence to demonstrate that any defendant but the LaHues participated in a conspiracy extending to the six hospitals other than Baptist. *See id.* at 1053. The "attorney defendants variance" reflects the acquittal of Ms. Lehr and Mr. Thompson at the close of the government's case. *See id.* Despite these variances, the district court denied the motions for a new trial. *See id.* at 1051-52, 1069-73. On appeal, Mr. Anderson claims these two variances entitle him to a new trial, while Dr. Robert LaHue argues the "attorney defendants variance" entitles him to a new trial. [21]

"Whether a variance between an indictment and the case presented at trial is sufficiently prejudicial to warrant a new trial is a question of law.... A new trial is only necessary, however, if the variance substantially prejudiced the defendant's right to a fair trial." *McClatchey*, 217 F.3d at 831. In *McClatchey*, this court faced the same two variances at issue here, concluded neither variance substantially prejudiced Mr. McClatchey's right to a fair trial, and reversed the

---

[21] Dr. Robert LaHue raises, for the first time on appeal, an alternative argument that the district court's severance of the false claims and witness tampering counts after the close of the government's case was a prejudicial variance warranting a new trial. However, he "has not attempted to articulate a reason for us to depart from the general rule that 'a federal appellate court does not consider an issue not passed upon below.'" *Walker v. Mather (In re Walker)*, 959 F.2d 894, 896 (10th Cir. 1992) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). Therefore, we decline to consider his alternative argument. *See id.*

district court's decision to grant Mr. McClatchey's motion for a new trial. *See id.* at 831-34. Because Mr. McClatchey, Mr. Anderson, and the LaHues were tried together, the government argues the law of the case doctrine forecloses our review of this issue and requires us to hold insufficient prejudice existed to require a new trial.[22] Defendants[23] claim the *McClatchey* panel "did not have a complete record and based its decision on factually erroneous conclusions," and, accordingly, we should find the law of the case doctrine does not control and revisit the issue. We hold the law of the case doctrine controls the "other hospitals variance" issue, and, in combination with the invited error doctrine, also controls the "attorney defendants variance" issue.

"The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir.) (quotation marks and citations omitted), *cert. denied*, 525 U.S. 905 (1998). "Furthermore, when a rule of law has been decided adversely to one or more

---

[22] Although the government also argues stare decisis controls this issue, we note its argument focuses on the law of the case doctrine and supporting case law. Accordingly, and in light of our resolution of this issue, we do not reach the government's stare decisis argument.

[23] In this section, "defendants" refers to Mr. Anderson and Robert LaHue.

-39-

codefendants, the law of the case doctrine precludes all other codefendants from relitigating the legal issue." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir.), *cert. denied*, 526 U.S. 1146 (1999). As a "rule of practice" and not a limit on a court's power,

> we will depart from the law of the case doctrine in three exceptionally narrow circumstances:
>
> > (1) when the evidence in a subsequent trial is substantially different;
> >
> > (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or
> >
> > (3) when the decision was clearly erroneous and would work a manifest injustice.

*Alvarez*, 142 F.3d at 1247.


As to the "other hospitals variance," Mr. Anderson does not argue any of these three exceptions apply. In addition, he claims Mr. McClatchey "was in all relevant respects identically situated to [Mr.] Anderson." Accordingly, we affirm the district court's denial of Mr. Anderson's motion for a new trial on the basis of the "other hospitals variance" in light of *McClatchey* and the law of the case doctrine. *See McClatchey*, 217 F.3d at 833-34 (holding "any variance caused by the narrowing of the conspiracy charge did not substantially prejudice [Mr.] McClatchey.")

As previously noted, defendants undertake the "formidable task" of attempting to convince us the *McClatchey* decision was clearly erroneous and would work a manifest injustice as to the "attorney defendants variance." *Alvarez*, 142 F.3d at 1247. Specifically, they claim "the panel partly based its decision that the attorney variance did not prejudice [Mr.] McClatchey on the erroneous premise that the jury 'was not informed that the district court had acquitted the attorney defendants' and therefore could not conclude he must have been guilty because the court had not acquitted him too" (quoting *McClatchey*, 217 F.3d at 833). However, they do not cite any case law in which such an argument prevailed. *See Alvarez*, 142 F.3d at 1247 ("[O]ur own research indicates that while courts may often pay lip service to the clearly erroneous/manifest injustice exception, they rarely, if ever, invoke it.").

We acknowledge defense counsel informed the jury of the attorney defendants' acquittal during closing arguments, but this does not make the *McClatchey* decision either clearly erroneous or even remotely work a manifest injustice for the following reasons. Although defendants call this a "crucial point," they acknowledge it was only one of several reasons why the *McClatchey* panel held Mr. McClatchey's right to a fair trial had not been substantially prejudiced due to this variance. *See McClatchey*, 217 F.3d at 831-33. Here,

defendants raise the same claims as did Mr. McClatchey, but do not challenge the *McClatchey* panel's other reasoning. Therefore, defendants themselves limit our review to this one claim of error regarding the jury's knowledge of the attorney defendants' acquittal.

Focusing on this sole error, we conclude the jury's awareness of the district court's acquittal of the attorney defendants did not substantially prejudice their right to a fair trial in light of the invited error doctrine. "The invited error doctrine prevents a party from inducing action by a court and later seeking reversal on the ground that the requested action was in error." *United States v. Edward J.*, 224 F.3d 1216, 1222 (10th Cir. 2000) (quotation marks and citation omitted). The *McClatchey* panel correctly determined the district court did not inform the jury of the attorney defendants' acquittal in its jury instructions. *See McClatchey*, 217 F.3d at 833. Instead, the jury was so informed by defendants' counsel during their closing arguments as a result of the following events.

Toward the end of its closing argument, the government stated: "The evidence in this case has been that the attorneys were well aware that the – that this was a paying for patients deal and worked to develop agreements that covered up that fact." On completion of the government's argument, the district

-42-

court recessed the proceedings and heard from Mr. Anderson's counsel about this statement. Counsel argued this statement "opened the door" to allow defense counsel to present to the jury the acquittal of the attorney defendants. The district court agreed and stated: "You may tell the jury that the two lawyer defendants were found – were acquitted by order of the court." Defendants' counsel each took advantage of this ruling.

In his closing argument, Mr. Anderson's counsel claimed the acquittal of the attorney defendants created reasonable doubt as to his client's guilt:

> In this case the quality of the Government prosecution creates reasonable doubt. And that's what the jury system is set out to do is to correct these abuses.
>
> For instance, the last argument that was made to you by the Government in this case had to do with the attorneys. And she said that they were knowing participants in a – knowing participants that this was a scheme to pay [sic] patients and that they drafted sham agreements.
>
> Well, folks, these two lawyers have been acquitted by the court. They were acquitted here because the court found that there was no evidence beyond a reasonable doubt that these lawyers had done anything. And yet the Government stood up here in argument, and despite the fact they had been acquitted, and told you that those lawyers had, in fact, been knowing participants in crime and that's just not right.
>
> That in itself should create a reasonable doubt as to all the other defendants in this case, particularly the Baptist defendants.
>
> ....

-43-

Now the attorneys have been acquitted in this case. If they're not guilty and Mr. Anderson relied upon what they said, does that – how does that affect Mr. Anderson's specific intent in the case? He cannot have the specific intent to violate the law if those lawyers, who are not guilty, advise him appropriately, which they did.

Dr. Robert LaHue's counsel similarly argued:

Now, one other thing that Ms. Treadway spoke about were some of the defenses that we have presented to you, and that is the defense of good faith. And all of the witnesses, all of the Defendants – the evidence is clear, that all of the Defendants relied on the attorneys who were acquitted in this case and relied on attorneys for other hospitals to process and review and prepare these agreements to make them legal and appropriate. The evidence is uncontroverted about that. Nobody ever took – you never had an attorney come in here and said they took my agreement and changed it, took it out and changed it or modified it. You never had that.

These attorneys were acquitted. And the testimony of all the witnesses was – certainly the hospital witnesses who employed the attorneys and witnesses concerning the Doctors' activities who said the Doctors knew about and relied on the advice of the attorneys that are – that are now acquitted and found not guilty. And so there is good faith here, no doubt about it.

Obviously, neither counsel believed their statements would prejudice defendants' right to a fair trial. In other words, they did not believe the jury would interpret the district court's acquittal of the attorney defendants, along with the continued prosecution of Mr. Anderson and Dr. Robert LaHue, as a signal the court believed defendants were guilty. Indeed, counsel affirmatively sought the opportunity to argue about the acquittal of the attorney defendants, rather than object to the government's argument and have it stricken along with

-44-

an instruction from the court for the jury to disregard the argument. We conclude the invited error doctrine applies and no prejudice was suffered, because defendants' argument on appeal is a complete reversal from the position they sought to and did assert during closing argument. *See John Zink Co. v. Zink*, 241 F.3d 1256, 1259 (10th Cir. 2001) (holding the invited error doctrine precluded review of appellants' argument on appeal that was directly contradictory to its position in the district court).

Finally, defendants fail to explain, as they must in order to prevail, how the application in this appeal of the ruling in *McClatchey* would work a manifest injustice. *See Alvarez*, 142 F.3d at 1247. Indeed, as discussed in *McClatchey*, the district court told the jury that "the charges against [the attorney defendants] ... have been removed from your consideration and are no longer before you for decision," and instructed them: "Do not concern yourself with these developments and do not speculate about them." *See McClatchey*, 217 F.3d at 833. "[T]his court presumes that the jury followed the district court's instructions and therefore did not speculate as to the reason why the charges against the attorney defendants had been removed from its consideration." *Id.* (citing *United States v. Ailsworth*, 138 F.3d 843, 850 (10th Cir.), *cert. denied*,

525 U.S. 896 (1998)). [24]   As a result, we do not perceive a manifest injustice resulting from the application of the *McClatchey* ruling on the identical "attorney defendants variance" issue raised in this appeal.

Accordingly, we affirm the district court's denial of defendants' motion for a new trial on the basis of the "attorney defendants variance" in light of *McClatchey* and the law of the case and invited error doctrines. *See id.* at 833-34 ("[E]ven if the district court's acquittal of the attorney defendants created a variance between the allegations in the indictment and the case presented at trial, this court is unconvinced that such a variance substantially prejudiced [Mr.] McClatchey.").

---

[24] Defendants argue they faced a "Hobson's choice" created by the government's closing argument quoted above – either let the government's claim go unchallenged or "reluctantly" tell the jury of the attorney defendants' acquittal, with prejudice either way. We do not agree. Defense counsel had a third option – they could have requested the district court strike that portion of the government's closing and instruct the jury to disregard the statement and focus on the jury instructions as to the attorney defendants, something defense counsel and the court did with regards to other portions of the government's closing. This would have returned defendants to the position deemed non-prejudicial in *McClatchey*, where the jury is presumed to follow the "district court instructions and therefore did not speculate as to the reason why the charges against the attorney defendants had been removed from its consideration." *McClatchey*, 217 F.3d at 833. Further, the statements to the district court and arguments to the jury on this issue by defense counsel clearly reveal their desire to present the acquittal of the attorney defendants to the jury; any reluctance in informing the jury of the acquittals must have accrued after these arguments were unsuccessful.

D. Use Immunity

In a two-part argument, the LaHues claim the district court abused its discretion by refusing to grant use immunity to twelve proposed defense witnesses who invoked the Fifth Amendment and refused to testify at trial. First, the LaHues argue the government is guilty of prosecutorial misconduct, because it allegedly engaged "in a plan to unduly distort the fact-finding process" by: (1) identifying these twelve individuals as unindicted co-conspirators; (2) leading them to believe, "in the pretrial setting," they faced potential criminal prosecution, which caused them to invoke the Fifth Amendment and refuse to testify; (3) claiming, "near the end of the trial," the government did not perceive them as criminally culpable; and (4) confirming, prior to sentencing in this case, it would not subject any of the unindicted co-conspirators to criminal charges. Second, the LaHues argue this prosecutorial misconduct authorized the district court to grant these twelve witnesses use immunity, and its refusal to do so constitutes an abuse of discretion.

In response, the government claims it appropriately listed these individuals as unindicted co-conspirators for Rule 801(d)(2)(E) purposes. It argues "[t]he defendants offer no facts of discriminatory use of immunity [by the government]

-47-

to gain a tactical advantage, and offer no facts that the government *forced* any witness to invoke the Fifth Amendment." (Emphasis in original.) Finally, it cogently notes the LaHues failed on appeal to identify the witnesses allegedly affected, proffer their expected testimony, or explain how the witnesses "were essential to their defense."

The district court rejected the LaHues' arguments for judicial grants of use immunity before, during, and after trial, emphasizing "there is no indication that the government engaged in a 'deliberate attempt to distort the fact finding process.'" *Anderson*, 85 F. Supp. 2d at 1081 (denying defendants' motion for a new trial based on prosecutorial misconduct) (quoting *United States v. Hunter*, 672 F.2d 815, 818 (10th Cir. 1982), *abrogation on other grounds recognized in United States v. Call*, 129 F.3d 1402, 1404 (10th Cir. 1997), *cert. denied*, 524 U.S. 906 (1998)). [25] We review the district court's decisions under an abuse of discretion standard. *See United States v. Gabaldon*, 91 F.3d 91, 94 & n.2 (10th

---

[25] During the trial, the district court granted defendants the alternative relief sought in their "Motion for Order Compelling Judicial Immunity." *See Anderson*, 85 F. Supp. 2d at 1081 n.29. Specifically, the district court gave defendants the opportunity to call the attorneys of some of these witnesses to testify, pursuant to Rule 807 of the Federal Rules of Evidence, about what the witnesses told FBI agents in government interviews. *See id.* Although they sought this relief, defendants decided against calling these attorneys as witnesses "based on strategic trial issues."

Cir. 1996).

"'The power to apply for immunity ... is the sole prerogative of the government being confined to the United States Attorney and his superior officers.'" *Hunter*, 672 F.2d at 818 (quoting *United States v. Graham*, 548 F.2d 1302, 1314 (8th Cir. 1977)). Accordingly, courts have no inherent authority to grant a witness use immunity. *See id.* However, in *Hunter*, we left open the possibility "that where the prosecutor's denial of immunity is a deliberate attempt to distort the fact finding process, a court could force the government to choose between conferring immunity or suffering an acquittal." *Hunter*, 672 F.2d at 818; *see United States v. Chalan*, 812 F.2d 1302, 1310 (10th Cir. 1987) (same), *cert. denied*, 488 U.S. 983 (1988).

We need not decide this legal question and are not persuaded to overturn the district court's finding for two reasons. First, the LaHues fail to "cite the precise reference in the record where the issue was ... ruled on" initially as required by our rules. 10th Cir. R. 28.2(C)(2). The district court's pretrial ruling on this issue is critical, because the court referred to and relied on its reasoning in that ruling to deny the subsequent motions. *See, e.g.*, *Anderson*, 85 F. Supp. 2d at 1081 ("The court rejects the defendants' arguments for the same reasons it

-49-

rejected them before and during trial."). While the LaHues cite to a "Minute Order" in which the district court memorialized its denial of their "motion for grant of judicial immunity or for stay [doc. 142] ... as set forth on the record," they do not identify where "on the record" the district court ruling exists. Second, as the government claims, the LaHues do not identify the twelve individuals at issue, provide a record citation for the proffer of their expected testimony, or explain how their testimony would be material, exculpatory, and not cumulative as well as unavailable from any other source. *See United States v. Bahadar*, 954 F.2d 821, 826 (2d Cir.) (requiring such evidence to find a distortion of the fact-finding process), *cert. denied*, 506 U.S. 850 (1992).

We will not "sift through" this case's voluminous record to find support for the LaHues' claims, "but instead defer to the district court's rulings." *Mile High Indus. v. Cohen*, 222 F.3d 845, 854 (10th Cir. 2000). Likewise, we will not substitute our judgment for that of the district court under the abuse of discretion standard of review, *see In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 669 F.2d 620, 623 (10th Cir. 1982), especially in the absence of facts identifying the material, exculpatory, and non-cumulative nature of the witnesses' testimony as well as its unavailability from any other source. *See United States v. Rodriquez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir.)

(holding it is the appellant's responsibility to tie the relevant facts, supported by specific citations to the record, to his legal arguments), *cert. denied* , 522 U.S. 847 (1997).

Accordingly, the district court did not abuse its discretion in refusing to grant immunity to the twelve unnamed defense witnesses, because use immunity is the sole prerogative of the executive branch and defendants provided no facts to support their claim the government engaged in a deliberate attempt to distort the fact-finding process. [26]

---

[26] Notwithstanding the basis for our decision, we have reviewed every document cited by the LaHues on this issue in their appellate briefs. In their "Motion for Order Compelling Judicial Immunity" filed on the close of the government's case, the LaHues listed twenty unindicted co-conspirators and presented "proffers of potential testimony" in varying levels of detail for fourteen of them. They repeated this list and attached a copy of these "proffers" to their motion for a new trial, which they inexplicably do not address or cite on appeal. Further, although the LaHues cite to the defense witness lists in their appellate briefs, they failed to provide these documents in the record on appeal.

Even if we were to consider this material as the basis for the LaHues' appeal of this issue, there are three reasons why it is insufficient to find the district court abused its discretion. First, we do not know whether the twelve witnesses on appeal are a subset of the twenty listed in these motions, or are others from the over 160 people defendants allegedly listed as witnesses but did not call at trial. Second, the LaHues provide information regarding testimony from only fourteen of the twenty witnesses listed in the motions, and of these: (1) it is unclear whether three were even subpoenaed by the defense or ever invoked the Fifth Amendment; (2) there is no proffer of testimony for four; (3) virtually the entire "proffer" of six are the conclusory assertions that the witness both "affirms," "confirms," "defend[s]," or "assert[s]" the "legitimate nature" of the relationship between the hospital and the LaHues and "did not perceive the relationship to be a payment for patients;" and (4) the four somewhat detailed proffers provide no basis

IV. Conclusion

For the foregoing reasons, the convictions of Mr. Anderson, Dr. Robert

LaHue, and Dr. Ronald LaHue are **AFFIRMED** .

---

for determining whether this testimony was unavailable from any other source. Finally, in their motion for a new trial, the LaHues claim the witnesses who did testify at trial presented "exculpatory" testimony for them, but do not explain how those who allegedly invoked the Fifth Amendment would offer testimony, assuming *arguendo* it was material and exculpatory, that would not be deemed cumulative.