**Raymond DIRKS, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 85–1475.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 15, 1986.

Decided Oct. 10, 1986.

Marc Bogatin, with whom Stanley S. Arkin, New York City, was on the brief, for petitioner.

Linda Fienberg, Associate Gen. Counsel, S.E.C., with whom Daniel L. Goelzer, Gen. Counsel, Larry R. Lavoie, Asst. Gen. Counsel and Paul Gonson, Sol., S.E.C., Washington, D.C., were on the brief, for respondent.

Before EDWARDS, GINSBURG and STARR, Circuit Judges.

Opinion for the court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This is a petition for review of the Securities and Exchange Commission's imposition of a six-month suspension sanction on Raymond Dirks, a brokerage firm principal, pursuant to section 14(b) of the Securities Investor Protection Act. The issues presented are (1) whether section 14(b) is unconstitutionally vague, and (2) if the statute passes constitutional muster, whether the SEC's findings are supported by substantial evidence. We conclude that, in light of a narrowing administrative construction by the SEC, section 14(b) is not void for vagueness, and that ample evidence in the record undergirds the Commission's findings.

I

In October 1980, Raymond Dirks joined John Muir & Co. ("Muir"), an established securities brokerage firm, as a limited partner. In April 1981, Dirks became a general partner, with a 54% equity interest in the firm. Dirks shared responsibility for Muir's management and control with John Sullivan, the firm's managing partner and 26% owner.

From January to April 1981, Muir had steadily increased the volume of securities trading for its own account. The firm's heavy stock purchases, however, placed a severe strain on its available cash. To compensate, Muir began borrowing money, using customer-owned securities as collateral. By April 1981, the customer-backed loans had reached such a level that the firm was forced to begin setting aside large amounts of cash in an insulated customer reserve account.[1] These set-asides exacerbated Muir's already serious cash-flow problem.

Donald Katz, Muir's comptroller, became increasingly disturbed by Muir's deteriorating financial situation. When the reserve deposits reached the $1 million mark in late April 1981, Katz warned Sullivan about the situation and advised him to partially liquidate the firm's trading positions in order to generate cash for day-to-day operations. Despite Katz's advice, Muir continued to increase its trading account.

Toward the end of May 1981, when the reserve account had climbed to nearly $5 million dollars (over 75% of the firm's capital), Katz arranged a meeting of Dirks, Sullivan, and other Muir officials. At that meeting, Katz strongly recommended that Muir reduce its trading positions to alleviate the firm's liquidity crisis. Notwithstanding their commitment to take this remedial action, Dirks and Sullivan failed to decrease Muir's trading account. To the contrary, Muir appears to have permitted its trading account to increase after Katz's admonition and in the face of mounting financial problems.

As the spring and summer progressed, Muir's financial condition continued to deteriorate. In view of the firm's growing cash-flow problems, Dirks procured $6.9

---

**1.** These set-asides were required by the SEC's Rule 15c3–3, 17 C.F.R. 240.15c3–3 (1986). Known as the Customer Protection Rule, this requirement is designed to ensure that a broker-dealer cannot use its customers' assets for oper-

ating capital. The rule thus requires a firm to create a special reserve account, which cannot be used for daily operations, when the firm is in a condition of net indebtedness *vis-a-vis* its customers. Respondent's Brief at 7.

million in loans. How the loan proceeds were in fact employed, however, remains unclear,[2] as the firm's unpaid bills mushroomed from $109,000 in May 1981 to $281,000 in June to $793,000 in July and finally to over $1 million in August.

In early August 1981, with the firm in acute financial distress, Muir's principals unsuccessfully tried to find a merger partner for the firm or to sell its retail business. When those efforts proved unavailing, Sullivan attempted to close the firm, a proposed step that was forbidden by an official of the New York Stock Exchange on the ground that Muir was in apparent compliance with the Commission's net capital rule.[3] Shortly thereafter, however, Katz's net capital computations revealed that Muir was in serious violation of the rule, with a deficiency of $1.7 million. At that point, Muir's general partners, including Dirks, agreed to the firm's liquidation under the Securities Investor Protection Act ("SIPA"), § 5(b), 15 U.S.C. 78eee(b) (1982). When it entered liquidation, Muir held $200 million in customer securities, several million dollars in cash, and had over 19,000 active customer accounts.

The SEC thereafter instituted an enforcement proceeding against Dirks and Sullivan. Following an evidentiary hearing, the Administrative Law Judge found both Dirks and Sullivan responsible for Muir's demise culminating in the SIPA liquidation. He also found that Dirks and Sullivan aided and abetted the firm's net capital violations during the period July 31–August 14, 1981. The ALJ concluded that Dirks and Sullivan should be permanently barred, pursuant to section 14(b) of SIPA, from association with any broker or dealer in a supervisory, managerial, financial, principal, or proprietary capacity.

On review, the SEC rejected the ALJ's finding that Dirks and Sullivan had aided and abetted Muir's net capital violations. However, the Commission decided to sanction both Dirks and Sullivan under section 14(b) of SIPA for their respective roles in Muir's financial collapse. Specifically, the Commission imposed a six-month suspension on Dirks and a one-year suspension on Sullivan. This petition for review followed.[4]

Section 14(b) of SIPA reads, in relevant part:

> The Commission may by order bar or suspend for any period any officer, director, general partner, owner of ten per centum or more of the voting securities, or controlling person of any broker or dealer for whom a trustee has been appointed ... from being or becoming associated with a broker or dealer, if after appropriate notice and opportunity for hearing, *the Commission shall determine such bar or suspension to be in the public interest.*

15 U.S.C. § 78jjj(b) (1982) (emphasis added). In this court, Dirks contends *first,* that section 14(b) is unconstitutionally vague, and *second,* that the SEC's finding of negligence is not supported by substantial evidence.

## II

■ *First.* We conclude that Dirks' void-for-vagueness argument is without merit. Although emphasizing the breadth of the statutory language, Dirks recognizes, as he must, that the SEC in 1976 placed a narrowing gloss on the provision in *Carrol P. Teig,* 46 S.E.C. 615 (1976). There, the SEC determined that section 14(b) did not impose a regime of strict liability on individuals whose firms enter SIPA liquidation. Instead, the Commission concluded that a broker's failure to act in a

---

**2.** At the evidentiary hearing, Dirks invoked the Fifth Amendment, leaving the record silent as to the purpose and eventual use of the loan proceeds.

**3.** Rule 15c3–1, 17 C.F.R. 240.15c3–1 (1986). Under the Commission's rule, "net capital" is defined as net worth reduced by certain specified

deductions. Broadly speaking, the rule provides that a broker-dealer must maintain a specified level of liquid assets.

**4.** Sullivan, whose sanction exceeded that imposed on Dirks, did not seek review. The proceeding before us therefore involves only Dirks.

responsible manner would form the basis for a bar or suspension. The SEC squarely held that simple neglect or nonfeasance provides an adequate basis for imposition of sanctions under section 14(b). *Id.* at 622.

The SEC based its conclusion in *Teig* on two factors. In the SEC's view, brokerage officials can reasonably be expected to be aware of the broker-dealer's practices and financial condition, and to take or demand remedial action to avoid the firm's financial demise. In addition, the fiscal irresponsibility and resulting collapse of brokerdealers during the 1960s was seen by the Commission as the major factor motivating Congress to enact SIPA. *Id.*

Under settled law, a broadly worded statute can be sufficiently clarified by a narrowing, authoritative interpretation to fend off a vagueness challenge. *Hoffman Estates v. Flipside,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982); *Giaccio v. Pennsylvania,* 382 U.S. 399, 403, 86 S.Ct. 518, 521, 15 L.Ed.2d 447 (1966). Dirks' principal response to this well-established principle is that this statute, containing a broad public interest standard, is vague beyond redemption. We disagree. "Public interest" criteria are, of course, found with regularity in the mod-

ern administrative state. *See, e.g.,* Clean Water Act, 33 U.S.C. § 1342(a)(1) (1982); Federal Communications Act, 47 U.S.C. § 307 (1982); Rail Transportation Act, 49 U.S.C. § 11344(c) (1982); Securities & Exchange Act of 1934, 15 U.S.C. § 78o(b)(1) (1984).[5] Over the years, Congress has seen fit to confer power upon various agencies to act in the "public interest" with respect to a broad range of matters, including the imposition of sanctions. *See, e.g.,* Securities & Exchange Act of 1934, 15 U.S.C. § 78o(b)(6) (1984).[6]

More fundamentally, Dirks' approach of turning a blind eye to administrative glosses on the statute brushes past the core concern of vagueness doctrine, namely that an individual be provided with sufficient warning that certain conduct is proscribed. *Hoffman Estates,* 455 U.S. at 497–99, 102 S.Ct. at 1192–93; *National Dairy,* 372 U.S. at 33–36, 83 S.Ct. at 598–99; *A.B. Small Co. v. American Sugar Refining Co.,* 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925). In its *Teig* opinion, the SEC authoritatively interpreted section 14(b) of SIPA to require a showing of negligence.[7] That narrowing and clarifying interpretation, in our view, eliminates any uncertainty that might otherwise have infected section 14(b).[8]

---

**5.** Once Congress has directed an agency to act in the "public interest," it then falls to the agency to elucidate and give specific content to the public-interest standard. For instance, under the Communications Act of 1934, the FCC is empowered to grant communications licenses where the public interest, convenience, or necessity will be served. 47 U.S.C. § 307(a). Pursuant to its statutory authority, the FCC has developed extensive, public-interest criteria to apply in determining whether a license should be granted. *See Radio Comm'n v. Nelson Bros.,* 289 U.S. 266, 278–87, 53 S.Ct. 627, 633–36, 77 L.Ed. 1166 (1933); *FCC v. Allentown Broadcasting Corp.,* 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955).

**6.** In upholding a regulatory statute against a void-for-vagueness attack, the Supreme Court has observed: "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. National Dairy Corp.,*

372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963) (citations omitted). In contrast, Dirks' approach stands in tension with the bedrock principle that reviewing courts should seek, if possible, a principled interpretation which sustains the constitutionality of legislation. *Id.*

**7.** No contention is made, nor could it reasonably be, that the fact of *Teig's* gloss on section 14(b) cannot properly be attributed to Dirks. Suffice it to say that the *Teig* opinion was published in the Commission's official reports and otherwise made available in accordance with the requirements of the Administrative Procedure Act. 5 U.S.C. § 552(a)(2) (1984).

**8.** We should note that we are not called upon and therefore do not address whether section 14(b) would pass constitutional muster without *Teig's* limiting gloss. We also observe that as a fallback, Dirks assails *Teig* itself, contending that the Commission erroneously construed section 14(b) to require simple negligence. In reviewing such a claim, we are mindful of the "'venerable principle that the construction of a statute by those charged with its execution

■ *Second.* Dirks' remaining contention is that substantial evidence is wanting to support the Commission's finding of negligence. Dirks emphasizes that he acted diligently by obtaining approximately $7 million in loans. As we observed above, however, the disposition of these proceeds remains enshrouded in mystery. No evidence was adduced to the effect that the proceeds were actually employed to stave off the impending disaster.

Dirks also urges that he acted responsibly since he attempted to merge, sell, or close Muir in August 1981. While those may well have been sound remedial measures, Dirks did not undertake those efforts until after his firm was in dire financial straits. And in any event, the SEC sanctioned Dirks for his negligence in permitting the firm to deteriorate to that extent in the first place.

Next, Dirks emphasizes that he was unaware of Muir's net capital violation until August 15, 1981, when the firm closed. This argument misses the mark. The SIPA charges brought against Dirks focus on his overall responsibility for the firm's collapse, not his responsibility *vel non* for the firm's net capital violation. In short, the SEC visited the suspension sanction upon Dirks because he failed to take reasonable measures in response to Muir's deepening financial crisis.

should be followed unless there are compelling indications that it is wrong....'" *E.I. du Pont de Nemours & Co. v. Collins,* 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100 (1977) (quoting *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)). Here, Dirks does not contend that *Teig* was wrongly decided based on the statute's language or legislative history. Instead, Dirks argues that section 14(b) must be construed to require "willfulness" because certain subsections of section 15 of the 1934 Act require willfulness. Congress, however, did not adopt a uniform culpability requirement in the federal securities laws. *See Aaron v. SEC,* 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 200, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). Instead, "Congress fashioned standards of fault in the express civil remedies in the 1933 and 1934 Acts on a particularized basis." *Hochfelder,* 425 U.S. at 200, 96 S.Ct. at 1384. Indeed, the fact

We are satisfied that the record evidence amply supports the Commission's determination. Finding no constitutional defect in the statute itself, as authoritatively construed, we conclude that the petition for review must be

*Denied.*

that Congress expressly requires proof of willfulness in some sections of the securities laws obviously demonstrates that when Congress wanted to require proof of willfulness, " 'it knew how to do so and did so expressly.'" *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 21, 100 S.Ct. 242, 248, 62 L.Ed.2d 146 (1979) (quoting *Touche Ross & Co. v. Redington,* 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979)) (concerning whether private damages remedy should be implied under the Investment Advisors Act of 1940).

Dirks also contends that because a broker-dealer may not be held derivatively liable under SIPA, actual misconduct is required for a sanction to lie under section 14(b). The principle that a broker-dealer should not be held liable for the acts of others obviously has no bearing on the principle at issue here, namely that the broker is accountable for his or her own negligent conduct.