# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 13, 2008        Decided June 26, 2009

No. 08-1038

STEPHEN J. HORNING,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

---

On Petition for Review of an Order
of the Securities & Exchange Commission

---

*Thomas D. Birge* argued the cause and filed the briefs for petitioner.

*Dominick V. Freda*, Senior Counsel, Securities & Exchange Commission, argued the cause for respondent. With him on the brief were *Brian G. Cartwright*, General Counsel, *Andrew N. Vollmer*, Deputy General Counsel, *Jacob H. Stillman*, Solicitor, and *Randall W. Quinn*, Assistant General Counsel.

Before: GARLAND and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Stephen J. Horning, the former president and director of Rocky Mountain Securities & Investments, petitions for review of an order of the Securities and Exchange Commission (SEC). The Commission found that Horning failed to exercise reasonable supervision over two employees who violated the securities laws, and that he caused his firm to commit numerous statutory and regulatory violations. The Commission permanently barred Horning from associating with any broker or dealer in a supervisory capacity and suspended him for twelve months from associating with any broker or dealer in any capacity. Horning contends that these sanctions were arbitrary and capricious, that he was denied due process in his administrative hearing, and that a provision of the Securities Investor Protection Act of 1970 under which he was sanctioned is unconstitutionally vague. Because we conclude that the Commission's order was reasonable and supported by substantial evidence, and because Horning's other challenges are without merit, we deny the petition.

I

In 1980, Horning founded Rocky Mountain as a penny-stock firm in Denver, Colorado. By the turn of the 21st century, Rocky Mountain had grown into a medium-sized broker-dealer, with approximately fifty registered representatives and more than 5,500 customer accounts. From 1981 to 2003, Horning served as president, director, financial and operations principal, compliance officer, and registered representative at Rocky Mountain. He was also the largest equity owner, holding nearly 40% of the shares at the time the firm closed.

Horning exercised substantial control over virtually every aspect of Rocky Mountain. He managed the firm, set policy, and oversaw daily operations. He had authority to hire and fire employees. He bore primary responsibility for ensuring

compliance with the SEC's net capital, customer reserve, and reporting requirements. He established the firm's supervisory procedures and oversaw their implementation, and he alone supervised the operations and trading departments.

The first unmistakable sign that something was amiss at Rocky Mountain appeared in early 2001, when a routine SEC staff examination revealed that, from May 2000 to February 2001, the firm's head trader, Judy Clarke, had failed to document trades as required and the firm had suffered over $600,000 in unreported losses. Each time Clarke bought and sold stocks in Rocky Mountain accounts and executed trades on behalf of its customers, she was supposed to chronicle the transaction on a "trade ticket" and submit it to Horning for approval and to the accounting department for recordkeeping. The examination disclosed that Clarke had ignored these procedures for more than $800,000 in purchases. Two other Rocky Mountain employees -- Leslie Andrade, the head of operations, and Tammy Steffen, the assistant director of compliance -- knew about Clarke's unrecorded trades but did not tell Horning. Andrade was responsible for keeping the firm's books and records, working with its auditor, and preparing the Financial and Operational Combined Uniform Single Reports (FOCUS Reports) that broker-dealers must file regularly with the SEC. *See* 17 C.F.R. § 240.17a-5. Andrade reported to Steffen until the latter left the firm in the spring of 2001; from that time on, both Andrade and Clarke reported exclusively to Horning.

In March 2001, following the staff examination, the SEC's Central Regional Office sent Horning, in his capacity as president of Rocky Mountain, a deficiency letter outlining numerous concerns that required "immediate corrective action or response, without regard to any other actions that the Commission may take or require to be taken as a result of the

examination." J.A. 696. Among other material deficiencies, the letter stated that Rocky Mountain had failed to: (1) calculate properly its net capital and customer reserves; (2) maintain accurate records of its assets and liabilities; (3) file accurate net capital computations in its annual audit reports; and (4) establish and employ adequate supervisory procedures for the preparation of its financial statements. In light of these failures, the letter indicated, Rocky Mountain had violated the federal securities laws.

The deficiency letter also pointed to troubling language in the annual evaluations prepared by Rocky Mountain's auditor, Mortland & Co., a one-person company run by Horning's college friend, Herbert Mortland. Every year since the early 1980s, Mortland's reports had highlighted weaknesses in Rocky Mountain's internal controls and warned that they "result in more than a relatively low risk that errors or irregularities in amounts that would be material . . . may occur and not be detected within a timely period." *E.g.*, J.A. 674. The deficiency letter advised that, notwithstanding these warnings, Mortland's audits had been inadequate in scope to detect the firm's many net capital and reserve requirement failings. This, too, violated SEC rules.

Horning responded to the deficiency letter approximately one month later. His brief missive to the SEC struck a defiant tone. "In response to the alleged violations regarding [the rules discussed in the deficiency letter]," Horning began, "we can only say, that, after 20 years in business, we are obviously aware of the above referenced rules and how such things as firm related trading errors, improperly classified securities positions, and the resultant inaccurate clearing account reconciliations can impact all of them in a negative way." J.A. 697. Horning continued:

> The only comment that we would like to make at this time is that these items certainly did not go undetected, as you say in your letter, and also that we would disagree with your statement that we do not have adequate written supervisory procedures to detect any inaccuracies in our clearing account reconciliations. In reality, the exact opposite was and is true.

*Id.* The letter concluded by assuring the SEC that "[t]he people at Rocky Mountain . . . responsible for these actions have been spoken to and dealt with," and that "[t]he deficiencies and concerns addressed in your letter have all been remedied." *Id.* at 698.

Horning did take some remedial measures in response to the deficiency letter. For example, he reduced the percentage return that Clarke received on profitable trades. And he instructed Andrade to prepare daily "reconciliation reports" documenting that all executed trades were properly recorded and balanced in Rocky Mountain's books, along with daily "trade error reports" documenting any trading irregularities or unreconciled trades that had occurred.

For the most part, however, Horning preserved the operational status quo. Although he later testified that the conduct of Andrade and Clarke had been "[b]asically" dishonest, J.A. 287, he declined to fire them, fine them, or restrict their activities. Clarke continued to execute trades in the firm's proprietary account at her discretion, just as before. Andrade continued to manage all of the firm's books and records, just as before. Horning did not establish any procedures to monitor Clarke's trading or to check the accuracy of Andrade's recordkeeping. Nor did he put in place any kind of operations manual. Similarly, although Horning testified that he was "very angry" at Mortland for failing to identify the

problems flagged in the deficiency letter and that Mortland was "partially at fault," *id.* at 283, Horning declined to fire Mortland or to demand new procedures for his subsequent audits. And he continued to take no action in response to Mortland's warnings about inadequate internal controls.

Moreover, Horning's implementation of those supervisory procedures that did exist was often perfunctory. Horning testified that he spent only two minutes reviewing each FOCUS Report he signed, and that he reviewed the reconciliation reports one day a week, for just ten seconds. Rocky Mountain kept some customers' funds in an omnibus money market account managed by a brokerage firm named Reich & Tang Services, which sent daily reports of transactions in the account. Horning never checked whether the figures in Andrade's daily reports or the firm's books matched the figures sent by Reich & Tang. Nor did he review executed trades, seek to verify the trade error reports, or inquire into whether the errors identified in the reports had been corrected.

This laissez-faire approach to supervision turned out to be a costly mistake, as Andrade and Clarke soon began to commit serious fraud. From April 2002 through January 2003, the two conspired to conceal approximately $6.5 million in losses that Clarke accrued in unreported, unauthorized trading in Rocky Mountain's accounts. They did this by entering fictitious profitable trades into the Rocky Mountain record system, omitting unprofitable trades, and then plundering $4.5 million in customer funds from the Reich & Tang account (as well as a substantial amount of firm funds) to pay for the losses. The firm's books, records, and reports became increasingly unmoored from reality. For more than six months in 2002, the reconciliation reports and financial statements prepared by Andrade never matched the daily reports sent by Reich & Tang. In the months immediately preceding January 2003, Rocky

Mountain's records listed the Reich & Tang account as having a value of greater than $4 million, while the Reich & Tang reports themselves showed that the account was in fact worth less than $100,000.

Horning testified that he was entirely ignorant of this scheme until January 2003, when Rocky Mountain's bank informed him that the firm's account was overdrawn. According to Horning, no one at Rocky Mountain apart from Andrade and Clarke had noticed the discrepancy between the firm's records and the Reich & Tang reports. He further testified that, upon learning of Andrade and Clarke's scheme, he immediately connected it to the "basically" dishonest activities revealed by the SEC staff examination. "I guess we're back to 2001," Horning remarked to the two of them. J.A. 433.

In February 2003, the SEC and the Securities Investor Protection Corporation (SIPC) sued Rocky Mountain for violating provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("Exchange Act"). A trustee was appointed; the firm was liquidated; and SIPC advanced more than $5 million to the estate to compensate customers for their losses. Andrade and Clarke were ultimately convicted of wire fraud and sentenced to prison.

Just days before Rocky Mountain ceased doing business, another college friend of Horning's, Edward Moloney, hired Horning and twenty-one other individuals associated with Rocky Mountain to join his broker-dealer, Moloney Securities Co. Horning became a director and regional vice president of Moloney Securities. At the time the Commission issued the decision challenged here, Horning was responsible for supervising twenty-seven representatives, among them Mark Depew and Buzz Massee, who had also worked for Horning at Rocky Mountain.

In February 2003, Horning learned that Depew and Massee had loaned Clarke money the previous year without notifying him, and that Clarke had repaid them in part with firm funds generated by fictitious trades. At his administrative hearing, Horning acknowledged that Depew and Massee should have realized that some of those trades were fictitious because they were made at "outlandish prices," and that the conduct of Depew and Massee in accepting Clarke's repayments without telling him had been "[p]robably" dishonest. J.A. 298-99. Although Horning withheld from Depew and Massee the trading profits they had purportedly earned in January 2003, he did not investigate their dealings with Clarke or place them under any form of heightened supervision at Moloney Securities.

In January 2006, the SEC instituted proceedings against Horning. An administrative law judge (ALJ) held a hearing for three days. Horning's own expert witness, Larry Hayden, testified that he was unaware of any other instance in which employees who caused an unauthorized $600,000 loss to a firm -- as Andrade and Clarke did in 2000-2001 -- had not been fired, J.A. 482; that heightened supervision of Andrade and Clarke "would probably have been appropriate" after March 2001, *id.*; that reconciliation reports initialed by Horning contained "obvious" mistakes, *id.* at 494-95; and that it was improper for Rocky Mountain not to have a procedure in place to verify that the Reich & Tang reports matched the firm's internal records, *id.* at 496-98. Hayden's testimony on cross-examination culminated in the following exchange regarding Horning's oversight of the Reich & Tang account:

> Counsel for SEC: [A]nd yet you still conclude that Mr. Horning's supervision was reasonable; is that right?

> Hayden:    It was reasonable when I wrote my report.
>
> Counsel for SEC:    Is it still reasonable today?
>
> Hayden:    I would alter my opinion in that regard.
> . . . .
> Counsel for SEC:    And you agree, therefore, [that] the supervision was inadequate?
>
> Hayden:    I would agree, based on this information, that it probably wasn't adequate.

*Id.* at 499, 501.

Section 15(b) of the Exchange Act authorizes the Commission to sanction a person associated with a broker or dealer who "has failed reasonably to supervise, with a view to preventing violations of the provisions of [the securities laws and rules and regulations thereunder], another person who commits such a violation, if such other person is subject to his supervision." 15 U.S.C. § 78*o*(b)(4)(E); *see id.* § 78*o*(b)(6)(A). The ALJ found that Andrade and Clarke violated Exchange Act § 10(b) and SEC Rule 10b-5, and that Horning failed reasonably to supervise Andrade and Clarke as required by Exchange Act § 15(b). *Stephen J. Horning*, Initial Decision Release No. 318, 88 S.E.C. Docket 2932, 2006 WL 2682464 (Sept. 19, 2006) [hereinafter Initial Decision].

Exchange Act § 15(c)(3) requires that brokers and dealers observe SEC rules prescribed to provide safeguards for the broker or dealer's financial responsibility when effecting the purchase or sale of securities, 15 U.S.C. § 78*o*(c)(3)(A); section 17(a) provides that brokers and dealers must make and keep records and reports required by SEC rules "for the protection of

investors," *id.* § 78q(a)(1); and section 17(e) requires that brokers and dealers file annual statements certified by independent public accountants, *id.* § 78q(e)(1)(a). The ALJ found that Rocky Mountain violated sections 15(c)(3), 17(a), and 17(e), and SEC rules thereunder, regarding net capital, customer reserve, and recordkeeping and reporting requirements. Under Exchange Act § 21C(a), a person can be found to have caused such violations if he was responsible for an act or omission that he knew or should have known would contribute to such violations. *Id.* § 78u-3(a). The ALJ determined that Horning was a cause of Rocky Mountain's violations pursuant to that provision.

Finally, Exchange Act § 15(b) specifically authorizes the Commission to "suspend for a period not exceeding 12 months, or bar . . . from being associated with a broker or dealer," a person who "has failed reasonably to supervise" another person as required by that section, if the Commission finds that such sanction "is in the public interest." 15 U.S.C. § 78*o*(b)(6)(A), (b)(4)(E). Section 14(b) of the Securities Investor Protection Act of 1970 (SIPA) authorizes the Commission "to bar or suspend for any period" any officer of any broker or dealer for which a trustee has been appointed from being associated with a broker or dealer if "the Commission . . . determine[s] such bar or suspension to be in the public interest." *Id.* § 78jjj(b). Pursuant to these sections, the ALJ permanently barred Horning from associating with any broker or dealer in a supervisory capacity and suspended him for twelve months from associating with any broker or dealer in any capacity. However, the ALJ rejected the Enforcement Division's recommendation of a $250,000 civil penalty as unnecessary and punitive.

In the order now on review, the Commission affirmed all of the ALJ's key factual and legal findings and sustained her choice of sanctions. *Stephen J. Horning*, Exchange Act Release

No. 56886, Investor Protection Act Release No. 167, 92 S.E.C. Docket 179, 2007 WL 4236161 (Dec. 3, 2007) [hereinafter Commission Opinion].

## II

Horning challenges the Commission's order on three principal grounds: (1) that the sanctions it applied to him were arbitrary and capricious; (2) that the Enforcement Division's mid-hearing change to its sanctions request violated his due process and statutory rights; and (3) that section 14(b) of SIPA is unconstitutionally vague. We consider these challenges in turn.

## A

An appellate court must uphold the Commission's findings of fact if they are supported by substantial evidence. 15 U.S.C. § 78y(a)(4); *Graham v. SEC*, 222 F.3d 994, 999 (D.C. Cir. 2000). We must uphold its other determinations unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Graham*, 222 F.3d at 999-1000. And we may not "disturb the Commission's choice of sanction unless it is either 'unwarranted in law or . . . without justification in fact.'" *Wonsover v. SEC*, 205 F.3d 408, 413 (D.C. Cir. 2000) (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185-86 (1973) (ellipsis in original)). We therefore "accord great deference to the SEC's [remedial] decisions." *WHX Corp. v. SEC*, 362 F.3d 854, 859 (D.C. Cir. 2004).

Horning does not contest any of the Commission's relevant factual findings, its legal conclusion that he was a "cause" under Exchange Act § 21C(a) of Rocky Mountain's various securities violations, or its legal authority to impose the sanctions it chose.

Nevertheless, he argues that the SEC's sanctions decision was arbitrary and capricious because the Commission failed to address evidence of his character and experience, misconstrued the auditor's annual reports and the SEC's 2001 deficiency letter, and imposed unnecessarily broad sanctions.

Each of these arguments is fundamentally flawed. Each fixates on a minor, discrete piece of the record while disregarding the larger context. In reviewing the Commission's comprehensive evaluation of his conduct, Horning would have us ignore the overall picture of his supervisory record and focus instead on a few isolated pixels. We reject the gambit.

First, Horning chides the Commission for ignoring evidence of his "long and successful career" and of his "skill and trustworthiness" -- in particular, testimony by Moloney, his friend and current employer, and by another friend who was a Colorado state judge. Pet'r Br. 13-14. But the Commission's decision does not depend on discrediting Horning's general skill or trustworthiness. It rests instead on his patent failure to fulfill his supervisory responsibilities.

The Commission found, on the basis of the overwhelming evidence that we have detailed in Part I, that Horning was negligent as a supervisor and principal and that he refused to accept responsibility for his actions. As the Commission observed, Horning did not only fail to take any steps to verify the underlying information reflected in Rocky Mountain's books, records, and filings; he also routinely failed to notice inconsistencies in the materials he did review. Every single reconciliation report examined by the Commission contained visible errors. Commission Opinion, at *4. To take just one example: Horning initialed a report that states on its summary page that $567,783.32 plus $953,821.54 equals $521,614.86. *Id.*; J.A. 829. Horning saw nothing wrong in this arithmetic --

no doubt because the ten-second review he acknowledged giving the document was not enough time even to look at the numbers.

The Commission further found that, in light of the "prior misconduct" of Andrade and Clarke and "the numerous red flags that served to warn Horning that he could not rely on these employees," Horning should have placed them under heightened supervision. Commission Opinion, at *10. Instead, he largely abdicated his supervisory responsibilities. The new procedures he implemented in 2001 were unhelpful, if not counterproductive, as they gave Clarke an incentive to trade more frequently and gave both Clarke and Andrade an incentive to conceal unreconciled trades. *Id.* at *9 (describing Clarke's reduced commission per trade and the increased financial penalties imposed for unreconciled trades). Horning's review of Andrade's reports "was so superficial as to be worthless." *Id.* And it escaped Horning's notice altogether that Andrade had engineered an informal coup within the operations department, removing two other employees from their role in reviewing the Reich & Tang account. Andrade and Clarke's fraudulent scheme was "not particularly well concealed," the Commission noted. *Id.* Horning could have uncovered it -- and staved off the demise of Rocky Mountain -- had he caught any of the "numerous blatant errors" in the reconciliation reports, "taken basic steps to ensure that the firm's records were consistent with those of its clearing agent," or checked the information sent daily by Reich & Tang against the firm's internal records. *Id.* at *9, *10.

Hence, while it is true that the Commission's opinion does not discuss Horning's professional accomplishments or the views of his character witnesses -- apart from one reference to Moloney's testimony that "he trusted Horning to fulfill his supervisory duties," *id.* at *13 -- these points were simply

immaterial in light of the substantial evidence of Horning's actual negligence as a supervisor at Rocky Mountain.

Second, Horning argues that "[t]he Commission's opinion relies heavily on the assertion that the auditor's reports provided warnings to Horning which he ignored," and that this was error because, according to Horning's reading, their "conclusion was just the opposite." Pet'r Br. 14-15. At oral argument, counsel for Horning explained that it was unreasonable for the Commission to conclude that the following passage -- repeated year in and year out in the audit reports -- provided any kind of relevant warning to Horning:

> The Company's plan of organization did not include adequate separation of duties related to daily cash receipt and cash disbursement activities. Appropriate supervisory review procedures were not instituted to provide reasonable assurance that adopted policies and prescribed procedures were adhered to.

*E.g.*, J.A. 674, 692. According to Horning's counsel, the second sentence in this passage describes not a general failure of supervisory procedures, as the Commission's opinion intimated, but only a failure of procedures related to cash receipt and disbursement activities. Because Andrade and Clarke's scheme did not involve those activities, and because the audit reports said that other procedures at Rocky Mountain were "adequate," *id.*, Horning claims there was nothing remiss in his lackadaisical response.

Notwithstanding Horning's construction of the passage from the audit reports, it was certainly reasonable for the Commission to read those two sentences as referring to two separate problems:  the company's failure to maintain adequate

separation of duties related to daily cash receipt and disbursement activities, and, more generally, its failure to institute appropriate supervisory review procedures to provide reasonable assurance that policies and procedures were adhered to. More important, it is not true that the Commission's opinion relies heavily on the audit reports or that its reading of them "pervades its entire opinion." Pet'r Reply Br. 1. Throughout its lengthy discussion of whether Horning violated the Exchange Act and which sanctions were appropriate, the opinion mentions the reports in only two sentences. Commission Opinion, at *8, *13. Both times, the Commission cites Horning's failure to respond as just one item on a long list of supervisory deficiencies.

Horning's similar contention about the SEC's 2001 deficiency letter fails for similar reasons. Horning maintains that the Commission erred in viewing the deficiency letter as a warning, because the letter "did not detect any internal control problems with what eventually caused the collapse of Rocky Mountain, the controls over the Reich & Tang account," Pet'r Br. 15 n.11, and because the SEC did not find at that time that Andrade or Clarke had committed fraud or recommend enforcement action against them, *id.* at 22-23. Once again, Horning overstates the Commission's reliance on one piece of evidence and proposes an unrealistic standard for what counts as a relevant warning. Even if Andrade and Clarke's 2000-2001 misdeeds were not precisely of the same type or extent as their 2002-2003 misdeeds, the deficiency letter clearly raised a red flag, and Horning's weak response clearly reflected a casual approach toward supervision.

Third, Horning contends that the Commission's decision to impose a lifetime bar from supervisory positions was excessive and punitive. In choosing this sanction, he asserts, the Commission "painted with too broad a brush" and "failed to

articulate why a more narrow brush would still not serve to protect the public interest." Pet'r Br. 18. He further insists that it was arbitrary and capricious for the Commission to refuse to confine the supervisory bar and the twelve-month suspension to finance and operations, the areas in which he committed violations at Rocky Mountain. In Horning's view, the Commission never explained "the quantum leap of extrapolating violations in one distinct area (financial and operational) to the remaining 7 categories of principals that function in a broker-dealer." *Id.* at 20. We disagree.

In the opinion on review, the Commission found that Horning's supervisory failures were egregious and recurrent, amounting to an "abdicat[ion] [of] his responsibility"; that he "acted recklessly by failing to implement basic supervisory procedures when confronted with previous misconduct"; that he provided no reliable assurances against future violations and, to the contrary, refused to acknowledge his own culpability; and that his "continued association in a supervisory capacity with Moloney Securities presents opportunities for future violations." Commission Opinion, at *13. In response to Horning's argument for carving out sales activities from the supervisory bar, the Commission further found that his decision not to place Depew or Massee under heightened supervision at Moloney Securities, his prior "supervisory failures[,] and his fundamental misunderstanding of the duties of a supervisor present[ed] too great a risk to investors to allow him to remain in the industry as a supervisor." *Id.* The Commission therefore determined that a full supervisory bar, coupled with a twelve-month suspension from any association with a broker or dealer, was needed to protect the investing public. *Id.* at *13-*14.

Every piece of this analysis is sound. The Commission thoroughly evaluated Horning's actions at Rocky Mountain, as well as his statements on the witness stand, and drew plausible

inferences about his expected future conduct. It then articulated a reasonable, protective rationale for the penalties it selected. *Cf. PAZ Sec., Inc. v. SEC*, No. 08-1188, --- F.3d ---, --- (D.C. Cir. May 29, 2009) ("[P]etitioners err in arguing the Commission must, in order to justify [its chosen sanction] as remedial, state why a lesser sanction would be insufficient."). Although Horning refuses to accept responsibility for Rocky Mountain's demise, he does not seriously contest that he effectively ignored the SEC's 2001 deficiency letter, that he failed to notice glaring errors during his perfunctory review of important documents, that he could have uncovered Andrade and Clarke's plot with minimal effort, and that he took only limited action in response to the evidence of misconduct by Depew and Massee. Indeed, the record in this case is devoid of a single example in which Horning actually identified an operational problem or an unreconciled trade, reduced the responsibilities of an employee, asked for an explanation before signing a document, or endeavored to confirm the accuracy of information his subordinates gave him. It is no surprise, then, that Horning's own expert witness agreed that Horning's supervision had been inadequate.

Contrary to Horning's suggestion, the Commission is not obligated to tailor its remedies to the precise job functions that a defendant failed to perform, and it may regard past supervisory problems in one area (e.g., finance and operations) as indicative of future risk in a different area (e.g., sales) where similar supervisory obligations apply. This case provides a good example why that is so. Given Horning's record at Rocky Mountain, it requires not so much a "quantum leap," Pet'r Br. 20, as a hop, skip, and a jump from the proof of his pervasive supervisory failures to the conclusion that he would pose a risk to the public in any supervisory capacity.

18

B

In its pretrial brief to the ALJ, the SEC's Enforcement Division requested that Horning be barred from "supervisory, non-supervised" positions in the industry. During the second day of the hearing -- after the Division had completed its case-in-chief and after Horning had begun his -- the Division changed the relief it requested to a bar from all supervisory positions, whether those positions are themselves supervised or not. Horning asserts that the Division's mid-trial correction -- not in the charge against him but in the sanction the SEC sought -- deprived him of his constitutional right to due process and of his statutory right to appropriate "notice and opportunity for a hearing" before the imposition of sanctions, 15 U.S.C. § 78*o*(b)(6)(A); *see also id.* § 78jjj(b).

It is true, as Horning points out, that in *In re Ruffalo* the Supreme Court held that a change in the *charges* against a petitioner during "quasi-criminal" proceedings before the Ohio Board of Bar Commissioners violated due process. 390 U.S. 544, 551 (1968). But as the Court subsequently explained in *Zauderer v. Office of Disciplinary Counsel*, "the feature of [*Ruffalo*] that was particularly offensive was that the change was such that the very evidence put on by the petitioner in defense of the original charges became, under the revised charges, inculpatory." 471 U.S. 626, 655 n.18 (1985). In *Zauderer*, by contrast, the court found no due process violation where "the variance [in] the theory" relied on by "the Board of Bar Commissioners had no such prejudicial effect on appellant." *Id.*

Nor was there any such prejudicial effect in this case. Unlike the petitioner in *Ruffalo*, Horning had notice from the outset of the nature of the charges against him. As the SEC noted, "Horning was aware [all along] that the issue in the case was the reasonableness of his supervision and that one of the

sanctions being sought by the Division was a supervisory bar." Commission Opinion, at \*14. The evidence that Horning presented did not become inculpatory after the specific sanction the Division sought was changed. Horning does not suggest that anything stopped him from reorienting his defense during the remainder of his trial presentation, or from doing so in his subsequent administrative appeal to the Commission. And even on this appeal, Horning does not explain how he was prejudiced by the change in sanction request -- or even suggest a single thing he would have done differently had that change not taken place.

In the absence of any suggestion of prejudice, we cannot conclude that Horning was deprived either of procedural due process or of appropriate "notice and opportunity for a hearing." 15 U.S.C. § 78*o*(b)(6)(A). Indeed, if there were any error at all, it was at most a harmless one. *See* 5 U.S.C. § 706 (directing reviewing courts to take "due account" of "the rule of prejudicial error"); *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 41 (D.C. Cir. 2005) (finding harmless error when petitioners failed to identify additional arguments they would have raised before the agency had the alleged procedural defect not occurred); *PDK Labs. Inc. v. U.S. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (stating that, under the harmless error rule, "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration").

C

Finally, Horning contends that the SEC's sanctions determination was unlawful because section 14(b) of SIPA is unconstitutionally vague. That section grants the Commission authority to bar or suspend an officer or director of a broker or dealer for which a trustee has been appointed if "the

Commission . . . determine[s] such bar or suspension to be in the public interest."  15 U.S.C. § 78jjj(b).

Horning acknowledges that this court rejected a void-for-vagueness challenge to section 14(b) in *Dirks v. SEC*, in which we held that the SEC's "narrowing and clarifying interpretation" of that provision "to require a showing of negligence" "eliminates any uncertainty that might otherwise have infected section 14(b)."  802 F.2d 1468, 1471 (1986).  He nonetheless contends that this "narrowing gloss . . . provides no notice to a respondent in Horning's situation where the evidence supports the conclusion that Horning reasonably believed that the firm was in good financial condition."  Pet'r Br. 24.  Horning's challenge has two flaws.

First, the evidence in this case does *not* support the conclusion that Horning's belief that Rocky Mountain was in good financial condition was reasonable.  Instead, the evidence shows that Horning could persist in that patently false belief only because of his own unreasonably deficient supervision.  As the SEC found, "Horning failed to exercise reasonable diligence in his supervision of Clarke and Andrade and in performing his duties with respect to the firm's net capital, customer reserve, and books and records requirements which resulted in the collapse of the firm."  Commission Opinion, at *14.

Second, Horning's attack on section 14(b) of SIPA is legally irrelevant because section 15(b) of the Exchange Act, 15 U.S.C. § 78*o*(b), provides an independent ground for the sanctions the Commission levied.  Section 15(b) authorizes the Commission, inter alia, to "suspend for a period not exceeding 12 months, or bar . . . from being associated with a broker or dealer" a person who "has *failed reasonably to supervise*, with a view to preventing violations of the provisions of [the securities laws and regulations], another person who commits

such a violation, if such other person is subject to his supervision" *and* if the Commission finds that such sanction "is in the public interest." *Id.* § 78*o*(b)(6)(A), (b)(4)(E) (emphasis added). As counsel for Horning conceded at oral argument, the Commission based Horning's sanctions independently upon both SIPA and the Exchange Act, and Horning does not claim that the latter has a vagueness problem. Thus, counsel acknowledged, Horning's void-for-vagueness challenge "only makes a difference if the court decides that the sanction can't be upheld under the [Exchange] Act." Oral Arg. Recording at 2:01-08; *see* Initial Decision, at *19 (explaining that "Section 15(b)(6) of the Exchange Act authorizes a [supervisory] bar" and that "Section 14(b) of SIPA provides an *independent* basis for barring Horning" (emphasis added)). Because we have determined that Horning's sanctions can -- and will -- be upheld under the Exchange Act, his challenge to SIPA § 14(b) is without consequence.

## III

For the foregoing reasons, the order of the Commission is

*Affirmed.*